PEOPLE v HERNDON

Docket No. 216239. Submitted August 8, 2000, at Lansing. Decided June
15, 2001, at 9:05 A.M. Leave to appeal sought.

Clarence W. Herndon, a prison inmate, was convicted by a jury in the
Washtenaw Circuit Court, David S. Swartz, J., of first-degree mur-
der. The victim had been the storekeeper of the inmate store in the
defendant's prison. The defendant had worked for the victim at the
store until the victim requested the defendant's reassignment. At
the time of the murder, the defendant was a member of a commit-
tee of inmates who made recommendations regarding items sold at
the store. The prosecution tried the defendant under alternative
theories of premeditation and deliberation, MCL 750.316(1)(a), or
murder of a peace officer or corrections officer, MCL 750.316(1)(c).
The defendant appealed.

   The Court of Appeals *held*:

   1. Subsection 316(1)(c) does not violate federal and state consti-
tutional guarantees of due process. Subsection 316(1)(c) makes it
first-degree murder for a person to murder a peace officer or cor-
rections officer while the officer is lawfully engaged in the per-
formance of the officer's duties and with the person knowing that
the victim is a peace officer or corrections officer engaged in the
performance of the officer's duties. Subsection 316(1)(c) does not
create a strict liability crime because, in order to convict a defen-
dant under its provisions, the prosecution must prove beyond a
reasonable doubt all the elements of first-degree murder, second-
degree murder, or felony-murder, each of which offenses requires
proof of criminal intent, either general intent or specific intent.

   2. The trial court did not abuse its discretion in denying the
defendant's motion to dismiss, which had been based on prearrest
delay. The defendant failed to show actual and substantial
prejudice from the sixteen-month delay in his arrest and arraign-
ment inasmuch as his claims of prejudice were merely speculative
and unsupported. Even if the defendant suffered prejudice, the rea-
son for the delay (the exhaustive investigation) was proper.

   3. The judgment of sentence incorrectly states that the defendant
was convicted of two counts of murder. On remand, the judgment
of sentence must be revised to state that the defendant was con-

victed of a single count supported by two theories (premeditation and deliberation under subsection 316[1][a] and murder of a corrections officer under subsection 316[1][c]).

4. The magistrate at the defendant's preliminary examination did not abuse her discretion in binding the defendant over for trial, and the trial court did not err in denying the defendant's motion to quash the information. There was sufficient evidence from which the magistrate could conclude that a corrections officer had been murdered and that there was probable cause to believe that the defendant had committed the murder. The evidence indicated that the victim had been murdered while discharging her duties as a corrections officer and that the defendant knew that the victim was engaged in the exercise of her duties as a corrections officer. No merit lies in the defendant's claim that the magistrate relied on inadmissible fingerprints and DNA evidence in binding him over and therefore abused her discretion in ordering the bindover. The evidence was admissible. Even if it were inadmissible, the other evidence sufficiently supported the bindover. The trial court did not err in denying the motion to quash the information inasmuch as the magistrate did not abuse her discretion in binding the defendant over for trial.

5. The trial court did not err in denying the defendant's motion to suppress evidence of inconsistent statements by the defendant to a resident unit officer and a resident unit manager when, without the benefit of advice of rights required by *Miranda v Arizona*, 384 US 436 (1966), he was asked to explain how he injured his hand. Contrary to defendant's contention, *Miranda* warnings were not necessary inasmuch as there was no nexus between custody and interrogation, i.e., the defendant, who was already in custody, was not taken into, or maintained in, custody to facilitate his interrogation. Additionally, the statements were not coerced inasmuch as the defendant was not threatened with misconduct citations if he did not answer the questions and the defendant was not handcuffed until after he gave the statements.

6. No merit lies in the defendant's claims that corrections officers violated his Fourth Amendment rights by searching his cell without a warrant and that the trial court erred in admitting into evidence the personal items seized during the search. The Fourth Amendment does not protect the defendant against searches of his cell, for which the defendant lacked a reasonable expectation of privacy.

7. The trial court did not abuse its discretion in denying the defendant's motion for appointment of a medical expert and in striking from the defendant's witness list two nurses who were

present when attempts to resuscitate the victim were made. The defendant sought to introduce testimony from those witnesses to support his theory that gross medical negligence during attempts at resuscitation constituted an intervening cause of death. Intervening medical error is a defense to a charge of homicide where the defendant has inflicted a nonfatal wound on the victim, but is not a defense where, as here, the defendant has inflicted a mortal wound on the victim.

8. The trial court did not abuse its discretion in permitting the prosecutor to call a corrections officer even though the corrections officer had not been endorsed on the prosecutor's witness list before trial. MCL 767.40a(4) allows a prosecutor to endorse a witness at any time upon leave of the court and for good cause shown or by stipulation of the parties. In this case, the prosecutor showed good cause for the late endorsement of the corrections officer by establishing that the prosecutor had expected, but did not get, from another witness testimony concerning the presence of the victim's blood on the defendant's shoes and that the prosecutor needed the corrections officer to testify about the blood evidence.

9. The defendant failed to show the plain error and prejudice necessary to merit a new trial with regard to his claim that the trial court erred in admitting DNA evidence showing that the victim's blood was found on the defendant's clothing. Michigan case law does not require that the foundation for admissibility of DNA evidence be established at a pretrial hearing. Here, the foundation for the DNA evidence was properly established at trial. A break in the chain of custody of the blood sample was not fatal in the absence of a contention by the defendant that the sample was lost, misidentified, or tampered with. The prosecution's DNA expert witnesses provided sufficient testimony regarding the low probability that blood found on the defendant's clothing was not from the victim.

10. The trial court did not abuse its discretion in allowing into evidence at trial a portion of the defendant's videotaped testimony during a pretrial hearing in which he stated that corrections officers, in retaliation for his "crime," were denying him access to materials needed for his defense. The statement at issue was an admission of a party-opponent and thus was properly submitted to the jury pursuant to MRE 801(d)(2). Because the statement was probative of the defendant's claim that he did not kill the victim, the trial court correctly admitted the statement on the basis that it was more probative than prejudicial. The trial court correctly allowed only a portion of the videotape of the pretrial hearing to be played for the jury, while allowing the defendant to explain the statement to the jury.

11. The trial court did not err in excluding hearsay evidence concerning inmates other than the defendant who could have murdered the victim. In order to avoid denying a defendant a fair trial, even hearsay evidence is admissible when critical to a defense. In this case, however, the exclusion of the hearsay evidence did not deprive the defendant of a fair trial because the defendant, through the use of other evidence, was able to present to the jury his theory that another inmate killed the victim.

12. The trial court did not err in denying the defendant's motion to exclude evidence that the victim had dismissed the defendant from his job at the prison store. The evidence was relevant to show the intent necessary to prove murder.

13. The trial court did not abuse its discretion in denying the defendant's motion to exclude photographs of the victim and the murder scene. The photographs were not so unfairly prejudicial that they should have been excluded under MRE 403. The photographs were probative of the defendant's intent to kill the victim and the pathologist's conclusion that the victim died from strangulation.

14. Contrary to the defendant's contention, there was sufficient evidence of premeditation and deliberation to support conviction of first-degree murder under subsection 316(1)(a) and sufficient evidence that the victim was performing her duties as a corrections officer at the time of her murder to support conviction of first-degree murder under subsection 316(1)(c). Premeditation and deliberation were established with evidence that the ligature used to strangle the victim had a loop in it that made it appear like a noose. Motive, as circumstantial evidence of premeditation, was established with evidence that the victim had dismissed the defendant from his job at the prison store. That the victim was killed while on the job as a prison storekeeper established that the victim was killed while performing her duties as a corrections officer.

15. No merit lies in the defendant's claim that the prosecutor elicited false testimony from the late endorsed corrections officer witness and that this violated the defendant's due process rights and requires a new trial. The defendant's claim of false testimony is unsupported by the record, and the prosecutor gave a plausible explanation for the late endorsement.

16. The trial court did not abuse its discretion in denying the defendant's motion for a jury view of the prison. The trial court correctly concluded that such a jury view posed a risk of physical harm and a risk that inmates would improperly communicate with the jury about the case. Additionally, the prison layout was ade-

quately illustrated by other evidence and the layout was less critical in this case than in other cases.

17. The trial court did not abuse its discretion in denying the defendant's motion to reopen proofs so that he could present evidence that he had been applying for new jobs in the prison. The trial court correctly determined that the proposed evidence was cumulative. The defendant failed to explain the relevance of the proposed evidence.

18. The trial court did not err in granting the prosecutor's motion for a special jury instruction concerning the defendant's inconsistent statements to corrections officers concerning how he sustained his hand injuries. The trial court's instruction regarding a false statement and its use as evidence of guilt was evenhanded, not favoring the prosecution over the defendant. Moreover, it is not error requiring reversal to instruct a jury that it can consider a false statement as evidence of guilt when, as in this case, there is other evidence that supports the guilty verdict.

19. There are no errors in this case that singly or cumulatively denied the defendant a fair trial such that he should be granted a new trial.

Affirmed; remanded for correction of judgment of sentence.

1. HOMICIDE — FIRST-DEGREE MURDER — MURDER OF A PEACE OFFICER OR CORRECTIONS OFFICER — DUE PROCESS — CRIMINAL INTENT.

The statute that makes murder of a peace officer or corrections officer first-degree murder does not create a strict liability crime and therefore does not violate constitutional guarantees of due process; a conviction under the statute requires proof beyond a reasonable doubt of all the elements of first-degree murder, second-degree murder, or felony-murder, each of which offenses requires proof of criminal intent, either general intent or specific intent (US Const, Am XIV; Const 1963, art 1, § 17; MCL 750.316[1][c]).

2. CRIMINAL LAW — DUE PROCESS — PREARREST DELAY.

A defendant must first demonstrate prejudice in order to establish a due process violation in the context of prearrest delay; the prosecution then bears the burden of persuading the court that the reason for the delay was sufficient to justify the resulting prejudice; the court evaluating the reason for the delay may consider the explanation for the delay, whether the delay was deliberate, and whether undue prejudice attached to the defendant.

3. CONSTITUTIONAL LAW — CUSTODIAL INTERROGATION.

A custodial interrogation implicates the advice of rights required by *Miranda v Arizona*, 384 US 436 (1966), only where there is some nexus between the custody and the interrogation.

4. SEARCHES AND SEIZURES — PRISON CELLS.

There is no reasonable expectation of privacy in a prison cell; prisoners therefore are not protected by the Fourth Amendment from searches of their cells (US Const, Am IV).

5. HOMICIDE — INTERVENING CAUSES — MEDICAL ERROR.

Intervening medical error is not available as a defense to a charge of homicide where a defendant has inflicted a mortal wound on the victim.

6. HOMICIDE — FIRST-DEGREE MURDER — MOTIVE.

Motive, although not an essential element of first-degree murder, is generally relevant to show the intent necessary to prove murder (MCL 750.316).

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *Brian L. Mackie*, Prosecuting Attorney, *and David A. King*, Senior Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Chari K. Grove*), for the appellant.

Before: M. J. KELLY, P.J., and WHITBECK and COLLINS, JJ.

WHITBECK, J. Defendant Clarence Herndon appeals as of right his jury conviction of first-degree murder[1] of a corrections officer. The trial court sentenced him to life imprisonment without parole, to be served consecutively to the prison sentence he was serving at the time of the killing. We affirm his conviction, but remand for administrative correction of clerical errors in his judgment of sentence.

---

[1] MCL 750.316.

## I. BASIC FACTS

Tammy Sperle worked in the prison store at the Huron Valley Men's Facility (HVMF) in Washtenaw County. Herndon worked at the prison store for about four weeks in the summer of 1994; at least part of that time was with Sperle. Though Sperle evidently had no complaints about Herndon's conduct, she asked prison officials to reassign him to another position elsewhere in the prison when an injury Herndon sustained prevented him from being able to lift heavy items, as the job required. When removed from his position at the prison store, Herndon filed a grievance. He also tried to be reinstated at the prison store several times, with the latest attempt on December 13, 1995.

Sperle went to work at the prison store on February 5, 1996. She met with Herndon and other inmates who served on the prison store committee, which met between 8:00 A.M. and 10:00 A.M. The store committee generally made recommendations to the storekeeper, Sperle, regarding what items to stock and the price at which to sell items. At this meeting, the committee members were given samples of soup to determine if the prison store should sell it.

At approximately 11:30 A.M., prison employee John Jeffries spoke with Sperle on the telephone, but when he walked past the prison store at 11:45 A.M., he noticed that it was closed. When Perry Taylor, an HVMF employee who worked in the prison warehouse, went to the store between 1:15 P.M. and 1:30 P.M. to deliver supplies, he discovered Sperle's body on the floor. Sperle was lying on her back, her arms were extended, and she was surrounded by blood. Taylor

used his key to enter the storeroom from a hall, but saw that another door that led to the front entrance to the prison yard was open. When he saw Sperle's body, Taylor immediately notified the corrections officer sitting outside the door that Sperle needed medical attention.

Harvey Dutcher, a hearing investigator at the prison, responded to the calls for help. He observed that Sperle looked as if she had been beaten badly, her face was bloody, and some of her teeth had been knocked loose. Dutcher checked for Sperle's pulse and when he did not feel one, he started cardiopulmonary resuscitation (CPR), but failed to revive Sperle. When Lola Garland, a resident nurse manager at the prison, arrived at the scene she performed mouth-to-mouth resuscitation while Dutcher performed chest compressions. She observed that Sperle's chest did not rise as expected when she blew air into Sperle's mouth. Garland believed that the victim was already dead because Sperle's skin was pale and cold. Dutcher and Garland both noticed a cup of instant soup lying on the floor a few inches from Sperle's body.

James Whiteman, a nurse at the prison, joined Dutcher and Garland in less than a minute after he received the distress call. Dutcher and Garland were already performing CPR on Sperle, but air was not entering Sperle's lungs. Whiteman, who observed that Sperle's facial bones were broken, tried to open Sperle's airway, but noticed that a cord was bound around her neck so tightly that it was imbedded in her skin and not visible to a casual observer. Whiteman then cut the cord off Sperle's neck and again began to perform CPR. He or another medical profes-

sional who responded to the call for help administered medication to Sperle to stimulate her heart, but Sperle never regained a pulse. Because Sperle's neck had become so swollen from the cord wrapped around her neck, Whiteman and an emergency medical technician performed a tracheotomy on Sperle in the hope that they would be able to get air into her lungs. The emergency medical professionals continued to attempt to revive Sperle as they transported her to the hospital, but never succeeded. Sperle was pronounced dead at the hospital.

Prison officials sounded an alarm at 1:45 P.M. According to Sergeant Lee Boardman and Ronald Koch, resident unit officers (RUO) in Herndon's housing unit at HVMF, the alarm required prison employees to lock all doors and secure the inmates in their cells so the employees could account for all the inmates. Neither man knew why the alarm had sounded, but they were instructed to do a room-to-room search to determine if any inmates had abrasions, marks, or cuts on their hands. Boardman and Koch both observed that Herndon had cuts and bruises around his fingers or knuckles; he was the only inmate with wounds that looked fresh.

After checking the other inmates, RUO Koch and resident unit manager (RUM) Dennis Hammond returned to Herndon's cell to ask him how he injured his hands. When Herndon gave conflicting stories, they placed him in handcuffs and took him to a segregation area, where Herndon was strip-searched and his shoes were confiscated. Prison officials subsequently searched Herndon's cell and seized a blue jacket with dark stains, a pair of green pants, and a pair of damp gloves. Their investigation into

Herndon's whereabouts before, during, and after the murder revealed that, following the prison store committee meeting, HVMF staff checked Herndon into his cell at 10:35 A.M. Herndon was released for lunch at approximately 11:55 A.M. and did not return until 12:50 P.M., even though he was only supposed to be gone thirty-five to forty minutes. At 1:00 P.M. Herndon was released unescorted with other inmates to go to the field house or to the yard.

Ervin Brown, an inmate who worked in the prison laundry in February 1996, was able to account for some of Herndon's time on the day of the murder. Brown said that Herndon brought him soup at approximately 10:00 A.M. Herndon then approached Brown in the laundry room at about 1:00 or 1:15 P.M. Brown thought that Herndon looked nervous or tense and had some blood on his face, which Brown removed with a soapy towel. Herndon reportedly asked Brown to wash his jacket and a pair of gloves, which Brown saw had blood on them. Brown asked Herndon if something was wrong and Herndon purportedly replied, "[D]on't worry about it. The less you know the better." Herndon then left the laundry, but returned approximately forty minutes later to retrieve the laundered jacket and gloves. At that time he gave Brown a pair of pants and a shirt to be washed immediately. Brown saw what appeared to be blood spots on the pants and told Herndon that he wanted to know what was going on and Herndon replied that "in a few minutes they were going to find a body." Brown said that he put the shirt and bloody pants in the blood pathogen hamper because the police did not "go into" that hamper, but before he could wash the clothes, the emergency siren sounded and he had to

return to his cell for the inmate count. The prison was locked down for the next four or five days, during which time Brown learned of Sperle's murder. He then contacted RUM Hammond to reveal what he knew. Brown showed RUM Hammond Herndon's bloody pants, which were still in the hamper.

DNA analysis conducted as part of the investigation into this crime revealed that Herndon's pants, jacket, and shoes had blood on them that matched Sperle's blood. Fingerprint analysis revealed that one of Herndon's fingerprints was on the soup container that was lying on the floor next to Sperle's body.

Herndon, who testified at trial, disclaimed any part in the murder and denied that the shoes and clothing introduced into evidence belonged to him. He explained that following the prison store committee meeting he gave inmates Brown and Johnson soup samples. According to Herndon, he injured his knuckles when he passed the soup sample through the food slot in Johnson's cell. He also said that he did not go to the dining room on the day of the murder. Instead, he went to the day room and had his soup sample for lunch. He was locked up from 12:45 P.M. until 1:00 P.M., when he went to the utility room to play chess. When he heard the alarm, he returned to his cell. Because his theory was that another inmate killed Sperle, Herndon called several other inmates to testify regarding who they believed had a reason or opportunity to commit the murder. For instance, one inmate stated that he saw inmate and prison store worker James Friar, who looked nervous, sitting on a bench near the prison store at around the time of the murder. Also, two weeks before the murder, inmate Steven Foster, another prison store worker, report-

edly threatened to kill Sperle and, on the day of the murder, he cut himself shaving and used a towel to wipe away the blood. Despite this evidence on behalf of the defense, the jury convicted Herndon of Sperle's murder.

## II. ARGUMENTS ON APPEAL

By our count, and even when combining arguments as logic dictates, Herndon has raised no less than eighteen issues in his appeal. While some issues stand alone, the vast majority relate to the evidence admitted or excluded at trial, with issues regarding pretrial procedure comprising the next largest category. For the most part, though Herndon has done his best to make each of these issues appear to be constitutional in nature, this is a routine appeal in the sense that most of the issues he raises are raised frequently in other appeals and properly considered without an analysis that focuses on constitutional principles. With plentiful case law defining the analysis on the majority of these issues, we attempt to avoid muddying the legal waters by providing only a brief examination of all but one of these issues. That single issue, which merits publication, is the one we address first: whether MCL 750.316(1)(c), prohibiting murder of corrections officers, violates due process.

## III. THE MURDER STATUTE

### A. STANDARD OF REVIEW

Whether a statute violates due process[2] is a ques-

---

[2] US Const, Am XIV; Const 1963, art 1, § 17.

tion of constitutional law this Court reviews de novo.[3]

## B. CONSTITUTIONALITY

At the time Sperle was murdered, the first-degree murder statute, MCL 750.316, provided in relevant part:

> (1) A person who commits any of the following is guilty of first degree murder and shall be punished by imprisonment for life:

> *          *          *

> (c) A murder of a peace officer or a corrections officer committed while the peace officer, or corrections officer is lawfully engaged in the performance of any of his or her duties as a peace officer or corrections officer, with knowledge that the peace officer or corrections officer is a peace officer or corrections officer engaged in the performance of his or her duty as a peace officer or corrections officer.

The statute defined a "corrections officer" to include a "prison or jail guard or other prison or jail personnel."[4] There is no dispute that Sperle, as an HVMF employee, plainly fit this definition of a corrections officer.

Herndon contends in part that this murder provision concerning only peace and corrections officers violates due process because it does not require the prosecutor to prove that he had a guilty intent at the time of the homicide, in effect making any killing of a peace or corrections officer a strict liability crime. A strict liability crime "impose[s] certain penalties regardless of the actor's criminal intent and regard-

---

[3] See *People v Walker*, 234 Mich App 299, 302; 593 NW2d 673 (1999).

[4] MCL 750.316(2)(a)(i).

less of what the actor actually knew or did not know."[5] The United States Supreme Court[6] and the Michigan Supreme Court[7] have generally disapproved of statutes imposing criminal liability without forcing the prosecutor to prove that the defendant had a criminal intent when committing the crime. Referring to this as the "ancient requirement of a culpable statement of mind," the United States Supreme Court explained in *Morrisette v United States*[8] that this mens rea requirement is so pervasive because

> [t]he contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.

Further, after explaining the genesis of the mens rea requirement under English common law,[9] the *Morrisette* Court noted that "[c]rime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand, was congenial to an intense individualism and took deep and early root in American soil."[10] Although this mens rea requirement has a long history and firm philo-

---

[5] *People v Quinn*, 440 Mich 178, 188; 487 NW2d 194 (1992).

[6] See *United States v Int'l Minerals & Chemical Corp*, 402 US 558, 563-564; 91 S Ct 1697; 29 L Ed 2d 178 (1971).

[7] See *People v Lardie*, 452 Mich 231, 239-240; 551 NW2d 656 (1996); *Quinn, supra* at 187.

[8] *Morissette v United States*, 342 US 246, 250; 72 S Ct 240; 96 L Ed 288 (1952).

[9] *Id.* at 251.

[10] *Id.* at 251-252.

sophical basis, neither federal[11] nor Michigan[12] law prohibits all strict liability crimes.

Nevertheless, the Michigan Supreme Court has indicated that the crime of murder, no matter its type, requires proof of intent.[13] Therefore we infer that the Legislature cannot classify a homicide as murder, as it has done for killings of peace and corrections officers in MCL 750.316(1)(c), without requiring some evidence of criminal intent. Accordingly, we must first determine whether the statute at issue truly creates a strict liability crime[14] by analyzing whether one or more elements of the crime require evidence of a "criminal mind."[15] In doing so, it is helpful to keep in mind that a statute may require proof of one of two different types of intent: general intent or specific intent. A statute that requires a prosecutor to prove that the defendant intended to perform the criminal act creates a general intent crime.[16] A statute that requires proof that the defendant had a "particular criminal intent beyond the act done" creates a specific intent crime.[17]

MCL 750.316(1)(c) consists of four elements. First, that the defendant committed a murder. Second, that

---

[11] See *Montana v Egelhoff*, 518 US 37, 58; 116 S Ct 2013; 135 L Ed 2d 361 (1996) (Ginsburg, J., concurring).

[12] See *Lardie, supra* at 240, citing *Quinn, supra* at 186-187.

[13] See *People v Aaron*, 409 Mich 672, 728-729; 299 NW2d 304 (1980).

[14] *Lardie, supra* at 239.

[15] *Quinn, supra* at 187-188 ("[W]here a statute requires a criminal mind for some but not all of its elements, it is not one of strict liability. In such a case, the Legislature is not imposing liability without any fault at all; instead, it has determined that regarding that element, responsibility for the protection of the public should be placed on the person who can best avoid the harm sought to be prevented—the actor himself.") (citation omitted).

[16] *People v Langworthy*, 416 Mich 630, 639; 331 NW2d 171 (1982).

[17] *Id.*, quoting *People v Depew*, 215 Mich 317, 320; 183 NW 750 (1921).

the victim was a "peace officer or corrections officer." Third, that the victim was "lawfully engaged in the performance of any of his or her duties as a peace officer or corrections officer." Fourth, that the defendant knew the victim was a peace officer or corrections officer performing lawful duties at the time of the murder.

The first element under MCL 750.316(1)(c) incorporates the proof necessary to sustain a conviction for murder. The crime of murder is defined by statute in Michigan and may be first-degree deliberate and premeditated murder,[18] second-degree murder,[19] or felony-murder.[20] All three of these forms of murder require proof of some form of criminal intent. First-degree murder is a specific intent crime,[21] which requires proof that the defendant had an intent to kill.[22] Second-degree murder is a general intent crime,[23] which mandates proof that the killing was "done with an intent to kill, an intent to inflict great bodily harm, or an intent to create a very high risk of death with the knowledge that the act probably will cause death or great bodily harm."[24] Felony-murder is also a general intent crime,[25] requiring evidence of one of the three intents necessary to prove second-degree murder.[26]

---

[18] MCL 750.316(1)(a).

[19] MCL 750.317.

[20] MCL 750.316(1)(b).

[21] *People v Biggs*, 202 Mich App 450, 454, n 1; 509 NW2d 803 (1993).

[22] *Langworthy, supra* at 650.

[23] *People v Bailey*, 451 Mich 657, 669; 549 NW2d 325 (1996).

[24] *People v Dykhouse*, 418 Mich 488, 508-509; 345 NW2d 150 (1984).

[25] *People v Levurn King*, 210 Mich App 425, 430; 534 NW2d 534 (1995).

[26] *Aaron, supra* at 728-729; see also *People v Carines*, 460 Mich 750, 758-759; 597 NW2d 130 (1999).

We conclude that MCL 750.316(1)(c) cannot and does not create a strict liability crime because, to be convicted of murder under its provisions, the prosecutor must prove beyond a reasonable doubt all the elements of one of these three forms of murder, each of which requires proof of a specific or general intent. The trial court in this case related this very information to the jury in its closing instructions, informing the jury that it had to find that Herndon "had one of these three states of mind: he intended to kill, or he intended to do great bodily harm to Tammy Sperle, or he knowingly created a very high risk of death or great bodily harm knowing that death or such harm was the likely result of his actions."

Herndon's related argument that MCL 750.316(1)(c) is essentially unconstitutional because a person who "only" committed second-degree murder could have his conviction elevated to first-degree solely on the basis of the victim's status, a strict liability element, is also unpersuasive. Michigan law is not offended when a statute has a single strict liability element.[27] More importantly, the aggravating circumstances under the statute do not consist solely of the victim's status as Herndon contends. Rather, it is the victim's status and conduct, *plus* the defendant's knowledge of that status, *plus* the fact that the defendant knew that the officer was lawfully performing the officer's duties at the time of the killing that elevate the crime from second-degree murder to first-degree murder. Further, case law suggests that proof of the defendant's knowledge creates a general intent requirement in the

---

[27] See *Quinn, supra* at 187.

fourth element of this crime.[28] Thus, even the element that makes killing a peace or corrections officer first-degree murder is not a strict liability element.

As for Herndon's argument that the statute impermissibly prevents a jury from ever convicting a defendant of second-degree murder when the prosecutor also relies on murder under MCL 750.316(1)(c) as a theory of criminal liability, this argument, too, is ultimately unpersuasive. Though the prosecutor exercises charging discretion, the jury is free to interpret the evidence when presented with a choice between conviction for second-degree murder and first-degree murder under the corrections officer provision. The facts of a particular case may indicate that the defendant was unaware that the victim was a peace or corrections officer, making conviction under this statute impermissible while nevertheless supporting a second-degree murder conviction. Alternatively, the jury may completely disregard evidence of the defendant's knowledge concerning the victim, preferring lenience and a second-degree murder conviction.[29]

Finally, in holding that MCL 750.316(1)(c) does not violate due process by creating a strict liability crime—indeed that it is not a strict liability crime— we echo the sentiments expressed by another panel of this Court[30] that recently commented on this stat-

---

[28] See *People v Motor City Hosp & Surgical Supply, Inc*, 227 Mich App 209, 216; 575 NW2d 95 (1997).

[29] See, generally, *People v Jackson*, 390 Mich 621, 625, n 2; 212 NW2d 918 (1973), quoting *Woodin v Durfee*, 46 Mich 424, 427; 9 NW 457 (1881) (" 'A jury may disbelieve the most positive evidence, even when it stands uncontradicted.' "); see also *People v Michael King*, 98 Mich App 146, 151; 296 NW2d 211 (1980) ("The underlying premise of lesser included offense analysis is that a jury is free to disregard any of the proof presented by the prosecution.").

[30] *People v John Clark*, 243 Mich App 424; 622 NW2d 344 (2000).

ute when upholding its constitutionality in the face of an equal protection challenge.[31] Peace and corrections officers "regularly risk their lives in the performance of their duties,"[32] to the benefit of all society. When peace and corrections officers are killed, the crime is not only heinous because of the victim's death, it is particularly serious because it tends to destabilize society by removing those who act as our protectors. Thus, we understand the Legislature's decision to categorize killing a peace or corrections officer as the most serious type of murder, even when requiring only proof of general intent in the element that elevates the crime to first-degree murder.

### IV. PREARREST DELAY

#### A. STANDARD OF REVIEW

Herndon argues that the trial court erroneously denied his motion to dismiss, which had been based on prearrest delay. Whether to grant a motion to dismiss is entrusted to the trial court's discretion, meriting review for an abuse of discretion.[33]

#### B. ACTUAL AND SUBSTANTIAL PREJUDICE

Sperle was murdered on February 5, 1996, and Herndon was arrested and arraigned on the murder charges on June 12, 1997. This delay was prejudicial, Herndon contends, because he was "illegally" detained in segregation, was denied access to per-

---

[31] US Const, Am XIV, § 1; Const 1963, art 1, § 2.

[32] *John Clark, supra* at 428.

[33] *People v Stephan Adams*, 232 Mich App 128, 132; 591 NW2d 44 (1998).

sonal and legal property, was denied use of a telephone and visitation, and eventually was unable to recall the events that occurred on the day of the murder and the names of prisoners who could have assisted in his defense. According to the prosecutor, this delay occurred because the police continued to investigate the crime by conducting witness interviews and performing DNA tests, which were not complete until April 28, 1997. The court ruled that defendant did not show actual prejudice due to the delay, but that even if he had suffered prejudice, the ongoing investigation justified the delay.

The trial court was correct in its analysis and conclusion.

> [I]n order to establish a due process violation in the context of prearrest delay a defendant must first demonstrate prejudice. The prosecutor then bears the burden of persuading the court that the reason for the delay was sufficient to justify whatever prejudice results. In evaluating the reason for the delay, the court may consider the explanation for the delay, whether the delay was deliberate, and whether undue prejudice attached to the defendant.[34]

Herndon has not carried his burden of showing actual and substantial prejudice because his claims were merely speculative and unsupported.[35] Moreover, as the trial court noted, Herndon knew that he was a suspect and, therefore, had "every reason to remember who his potential witnesses" were. Even if he did suffer actual prejudice, the reason for the delay—the

---

[34] *People v McIntire*, 232 Mich App 71, 94; 591 NW2d 231 (1998), rev'd on other grounds 461 Mich 147; 599 NW2d 102 (1999), discussing *People v Bisard*, 114 Mich App 784, 791; 319 NW2d 670 (1982) (citations omitted).

[35] See *McIntire*, *supra* at 95; *People v James Williams*, 114 Mich App 186, 202; 318 NW2d 671 (1982).

exhaustive investigation—was proper in this case.[36] Thus, we conclude that the trial court did not abuse its discretion in denying the motion to dismiss.

### V. CHARGING DISCRETION

#### A. STANDARD OF REVIEW

Herndon contends that the prosecutor erred in bringing two separate charges of murder against him when only one murder occurred in this case. We "review a charging decision under an 'abuse of power' standard, questioning whether a prosecutor has acted in contravention of the constitution or the law."[37]

#### B. ALTERNATIVE THEORIES

The parties agree that a

> prosecutor has broad discretion when charging defendants, *People v Venticinque*, 459 Mich 90, 100-101; 586 NW2d 732 (1998), and "it is generally permissible [for a prosecutor] to charge in a single information all offenses which do arise out of a single criminal transaction or occurrence," *People v Nicolaides*, 148 Mich App 100, 102; 383 NW2d 620 (1985).[38]

The parties also agree that the prosecutor was free to use alternative statutory theories to support a single murder charge in this case.[39] Indeed, this was how the prosecutor proceeded at trial and how the trial court instructed the jury, which returned a single verdict supported by two theories. The prosecutor, however,

---

[36] *People v Cain*, 238 Mich App 95, 110-111; 605 NW2d 28 (1999).

[37] *People v Barksdale*, 219 Mich App 484, 488; 556 NW2d 521 (1996).

[38] *People v Goold*, 241 Mich App 333, 342-343; 615 NW2d 794 (2000) (alterations in *Goold*).

[39] See *People v Bigelow*, 225 Mich App 806, 807 (1997) (*Bigelow I*).

does not acknowledge that, technically, the two criminal informations filed in this case each lists two separate charges of murder for Sperle's death, with each charge described in a separate count. This was error. The prosecutor should have brought a single charge of murder in a single count, listing under it the alternative theories.[40] Nevertheless, this error does not require reversing Herndon's conviction because the judgment of sentence indicates that he was actually sentenced for only one murder conviction, which is all that is necessary to protect his rights.[41]

In reviewing the record to analyze this issue, we came across two other small errors in the judgment of sentence that, while not meriting substantive relief to Herndon, nevertheless require us to remand this case so that the trial court can correct these errors administratively.[42] First, the judgment of sentence reflects conviction of two counts of murder despite the jury's clear statement to the contrary on the record. The judgment of sentence must be revised to state that Herndon was convicted of a single charge of murder supported by two theories: premeditation and deliberation under MCL 750.316(1)(a) and murder of a corrections officer under MCL 750.316(1)(c). Second, the judgment of sentence should not indicate that Herndon was convicted of felony-murder, MCL 750.316(1)(b). Evidently, the erroneous reference to felony-murder, which has crept into this appeal as well, arose because the original criminal information

---

[40] *Nicolaides, supra* at 103.

[41] *Id.*; see also *People v Bigelow*, 229 Mich App 218, 222; 581 NW2d 744 (1998) (*Bigelow II*).

[42] See, generally, *People v Avant*, 235 Mich App 499, 521; 597 NW2d 864 (1999).

listed felony-murder in count I. At the preliminary examination, the district court magistrate granted the prosecutor's motion, to which Herndon did not object, to correct the error in the information by substituting murder of a corrections officer for felony-murder. There is no question that Herndon was tried and convicted on theories of premeditated and deliberate murder as well as murder of a corrections officer, which the judgment of sentence should now reflect with the appropriate statutory citations. Herndon is not entitled to a resentencing hearing on remand because this is an administrative task.[43]

## VI. BINDOVER

### A. STANDARD OF REVIEW

Herndon argues that the district court erred in binding him over for trial and the circuit court erred in denying his motion to quash the information because there was insufficient evidence of the charges. We review the district court magistrate's decision on bindover for an abuse of discretion and review de novo the circuit court's decision to deny the motion to quash because it concluded that the magistrate had not abused her discretion.[44]

### B. PROBABLE CAUSE

In order to bind over a defendant for trial, the district court magistrate must determine that a crime was committed and that there is probable cause to

---

[43] MCR 6.429.

[44] *People v Crippen*, 242 Mich App 278, 281-282; 617 NW2d 760 (2000).

believe that the defendant committed the crime.[45]
Contrary to Herndon's contention, the evidence intro-
duced at the preliminary examination clearly demon-
strated that there had been a murder of a corrections
officer. While he refuses to acknowledge the evidence
that Sperle was lawfully engaged in her duties as a
corrections officer at the time she was murdered, the
record clearly indicates otherwise. Sperle was not
only murdered at the prison where she worked, she
was killed during her work hours at the place she car-
ried out her official duties running the prison store.
The evidence indicated that Herndon knew that
Sperle was a corrections officer, having worked with
her in the past. Further, the evidence circumstantially
demonstrated that he knew she was discharging her
official duties at the time she was murdered because
Herndon had met with her that very morning to dis-
cuss what would be sold in the store, including soup
products like the package found near her body. There
would be no plausible reason for Sperle to be in the
prison store other than to carry out her lawful duties
there.

We flatly reject Herndon's argument that the
bindover was erroneous in this case because there
was insufficient evidence that he had committed fel-
ony-murder. The magistrate did not bind him over for
trial on a felony-murder charge. As for Herndon's
argument that the magistrate abused her discretion in
binding him over for trial because she relied on
legally inadmissible fingerprint and DNA evidence, we
do not believe that the evidence was inadmissible.
Even if it were inadmissible, the other evidence was

---

[45] *Id.* at 282; MCL 766.13.

sufficient to establish probable cause in this case. Given that the district court magistrate clearly and unequivocally exercised her discretion properly in binding Herndon over for trial, we see no error in the circuit court's decision to deny the motion to quash the information.

## VII. MOTION TO SUPPRESS

### A. STANDARD OF REVIEW

Herndon claims that the trial court erred in denying his motion to suppress the inconsistent statements he made to explain how he injured his hand because RUO Koch and RUM Hammond did not give him *Miranda*[46] warnings, in violation of his right to be free from compelled self-incrimination.[47] In reviewing suppression hearing findings, this Court defers to the trial court's factual findings unless they are clearly erroneous.[48] However, we review de novo the question critical to this issue, which is whether Herndon was "in custody" at the time he made the statements.[49]

### B. CUSTODIAL INTERROGATION

*Miranda* warnings are necessary only when the accused is interrogated while in custody, not simply when he is the focus of an investigation.[50] Custodial interrogation is " 'questioning initiated by law enforcement officers after a person has been taken into

---

[46] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[47] See US Const, Am V; Const 1963, art 1, § 17.

[48] *People v Mendez*, 225 Mich App 381, 382; 571 NW2d 528 (1997).

[49] *Id.*

[50] *People v Hill*, 429 Mich 382, 387-393; 415 NW2d 193 (1987).

custody or otherwise deprived of his freedom of action in any significant way.' "[51] Furthermore, "[i]n addition to the elements of 'custody' and 'interrogation,' there must be some nexus between these elements in order for *Miranda* to apply."[52] That a defendant is in prison for an unrelated offense when being questioned does not, without more, mean that he was in custody for the purpose of determining whether *Miranda* warnings were required.[53]

Herndon was in prison for an unrelated offense at the time RUO Koch and RUM Hammond questioned him. Thus, he was in "custody" at the time he was questioned. However, there was no nexus between his "custody" and his "interrogation"; that is, Herndon "was not taken into, or maintained in, custody to *facilitate* his interrogation."[54] Questioning Herndon about the injuries to his hands in his regular prison cell was not the " 'inherently compelling' " atmosphere against which *Miranda* protects.[55]

Contrary to Herndon's related argument that the statement he made was the product of coercion, the trial court did not clearly err in finding that the statement was freely made. Herndon has never demonstrated that he would have been subject to any particular penalty, such as being issued a misconduct citation, for refusing to answer the questions posed to him regarding the injury to his hands. Nor did the officers indicate in their testimony that they threatened him with a misconduct citation if he

---

[51] *Id.* at 387, quoting *Miranda, supra* at 444.

[52] *People v Honeyman,* 215 Mich App 687, 694; 546 NW2d 719 (1996).

[53] *Id.* at 695.

[54] *Id.* (emphasis added).

[55] *Id.* at 694, quoting *Miranda, supra* at 467.

refused to answer their questions. To the contrary, RUM Hammond testified that he has never issued a misconduct citation to a prisoner for refusing to answer a question and that if Herndon had refused to answer the questions he probably would not have issued one. Furthermore, the officers did not put Herndon in handcuffs until *after* they asked him about his hands, which indicates that they were not coercing him at the time he made the statements. Therefore, not only were *Miranda* warnings unnecessary at the time Herndon made the statements because he was not in custody connected to the interrogation, the officers did not actually coerce him to make these statements. Accordingly, the trial court did not err in denying the motion to suppress these statements.

### VIII. WARRANTLESS SEARCH

Herndon claims that corrections officers violated his Fourth Amendment rights by searching his cell without a warrant while he was in administrative segregation and that the trial court erred in admitting into evidence the personal items they seized during the search. We disagree. Herndon lacks a reasonable expectation of privacy in his prison cell and, therefore, the Fourth Amendment does not protect him against searches of his cell.[56] Further, there is no evidence that the corrections officers were searching his cell just to harass him. Therefore, the case law he cites, consisting primarily of civil cases, is distinguishable.

---

[56] *Hudson v Palmer*, 468 US 517, 525-526; 104 S Ct 3194; 82 L Ed 2d 393 (1984); *People v Phillips*, 219 Mich App 159, 161; 555 NW2d 742 (1996).

## IX. GROSS MEDICAL NEGLIGENCE

### A. STANDARD OF REVIEW

Herndon contends that the trial court erred in denying his motion to appoint a medical expert and in striking two nurses from his witness list, each of whom, he claims, would have supported his defense of intervening cause of death. We review these questions for an abuse of the trial court's discretion.[57]

### B. INTERVENING CAUSE

Before trial, Herndon asked the trial court to appoint a medical expert so that he could establish that negligent efforts to resuscitate Sperle caused her death, not strangulation. The trial court ruled that it was unnecessary to appoint a medical expert to support this intervening cause defense[58] because the evidence would not support it. When Herndon later included in his list of trial witnesses the names of two nurses who were at the scene of the murder during attempts to resuscitate Sperle, the trial court asked him the purpose of their testimony. When Herndon admitted that he intended to call them to testify with regard to his theory that the resuscitation efforts killed Sperle, the trial court had the nurses' names stricken from the witness list because of its earlier

---

[57] See, generally, *People v Howard*, 226 Mich App 528, 551; 575 NW2d 16 (1997) (trial court has discretion to preclude testimony); *People v Carson*, 217 Mich App 801, 806 (1996) (whether to appoint an expert for the defense is entrusted to the trial court's discretion).

[58] If a third party's "independent act" "intervenes between the act of a criminal defendant and the harm to a victim, that act may only serve to cut off the defendant's criminal liability where the intervening act is the sole cause of harm." *People v Bailey*, 451 Mich 657, 677; 549 NW2d 325 (1996).

ruling concerning Herndon's ability to assert the intervening cause defense.

Herndon's argument has some merit. As a practical matter, a defendant may be entitled to have an expert available to help prepare for a trial, even if the expert does not provide a complete defense to criminal liability but, for instance, helps the defense by impeaching the prosecution's experts.[59] The critical question is whether the defense "cannot safely proceed to a trial" without the expert's assistance.[60] Similarly, case law suggests that whether there was an intervening cause of death can be a jury question, which requires the trial court to allow the defense to call witnesses to help establish a factual basis[61] for the defense even if the jury would have ultimately rejected it.[62] Nevertheless, even if the trial court erred in denying the motion to appoint the expert and in barring the nurses from testifying, these errors were harmless. Neither ruling completely prohibited Herndon from mounting a defense. He was able to present witnesses who testified why others might have committed the crime.

More importantly, "[i]n the medical treatment setting, evidence of grossly negligent treatment constitutes evidence of a sole, intervening cause of death. Anything less than that constitutes, at most, merely a contributory cause of death, in addition to the defen-

---

[59] See *In re Attorney Fees of Klevorn*, 185 Mich App 672, 679; 463 NW2d 175 (1990).

[60] MCL 775.15.

[61] See, generally, *Bailey, supra* at 672 (discussing need for evidence of intervening cause to support instruction concerning the doctrine).

[62] *People v Anthony Clark*, 171 Mich App 656, 659; 431 NW2d 88 (1988) ("The determination of proximate cause or of the existence of an independent intervening cause of death is an issue for the jury.").

dant's conduct."[63] In this case, the evidence demonstrated that Sperle was dead *before* the resuscitation efforts began, meaning that the resuscitation efforts could not have been the "sole, intervening" reason for Sperle's death.[64] Herndon, however, contends that the fact that those who responded to the scene of the crime attempted to resuscitate her at all suggests that she really was alive at that time. We think it possible that the individuals who responded to help Sperle had that aim solely in mind at the time, irrespective of the probability that their efforts could make any difference. In other words, their decision to take steps to revive Sperle did not, in and of itself, indicate whether she was alive.

In any event, this argument is unavailing because the intervening cause doctrine concerning grossly negligent medical care applies to nonfatal wounds that the defendant could not anticipate[65] would cause death. If thoroughly and extraordinarily incompetent[66] medical care killed the victim, it would break the chain of causation, absolving the defendant of criminal liability. As the Michigan Supreme Court explained long ago in *People v Cook*:[67]

> In a case where the wound is not mortal, the injured person may recover and thus no homicide have been committed. If, however, death do [sic] result, the accused will be held responsible, unless it was occasioned, not by the wound, but by grossly erroneous medical treatment. But

---

[63] *Bailey, supra* at 679.

[64] *Id.*

[65] See *People v Webb*, 163 Mich App 462, 465; 415 NW2d 9 (1987) ("The concept of an intervening cause is predicated upon foreseeability.").

[66] Ordinary medical negligence is foreseeable and, therefore, does not cut off criminal liability. See *id.*

[67] See *People v Cook*, 39 Mich 236, 240 (1878).

where the wound is a mortal one, there is no chance for the
injured person to recover, and therefore the reason which
permits the showing of a death from medical treatment
does not exist.

Modern courts have made the similar observation
concerning the difference between fatal and nonfatal
injuries when applying or rejecting the intervening
cause doctrine.[68] Although the intervening cause doc-
trine may not absolve the defendant of criminal
responsibility when there is a causal link between a
nonfatal injury and the victim's death,[69] it most defi-
nitely does not apply to an injury that is fatal.[70] There
can be no doubt that the ligature, wrapped around
Sperle's neck with so much force that it was embed-
ded in her skin and initially invisible to trained medi-
cal personnel, caused a mortal wound. Indeed, the
brutality of this wound indicates that it was intended
to kill. Thus, even if the trial court should have
granted the motion to appoint an expert and allowed
the nurses to testify at trial, the error was harmless
because the intervening cause doctrine could not
apply in this case and, therefore, it is *not* "more prob-

---

[68] See, e.g., *People v Bowles*, 461 Mich 555, 559; 607 NW2d 715 (2000)
(the fatal wound the defendant inflicted, not the decision to discontinue
life support, caused the victim's death).

[69] See *People v Flenon*, 42 Mich App 457, 462; 202 NW2d 471 (1972) (the
defendant should have been able to foresee that inflicting wound that
would require transfusion of large amount of blood would expose the vic-
tim to the risk of contracting blood-borne disease endemic in blood
supply).

[70] *People v Thomas Williams*, 107 Mich App 798, 802; 310 NW2d 246
(1981), rev'd on other grounds 413 Mich 940 (1981) (*Williams I*) ("Inter-
vening medical error is not available as a defense to a defendant who has
inflicted a mortal wound upon a victim.").

able than not" that these errors affected the outcome in this case.[71]

### X. LATE WITNESS ENDORSEMENT

#### A. STANDARD OF REVIEW

Herndon contends that the trial court erred in allowing the prosecutor to call corrections officer (CO) Scott Bentley to testify at trial even though he had not been endorsed on the prosecutor's witness list before trial. We review the trial court's decision to determine if it abused its discretion.[72]

#### B. GOOD CAUSE

In his opening argument, the prosecutor told the jury that the evidence would show that the shoes on Herndon's feet were taken from him when he was strip-searched and that a speck of blood found on his shoes matched Sperle's blood. On direct examination by the prosecutor, RUM Hammond testified that he observed other corrections officers strip-search Herndon and take all the clothing that Herndon was wearing, which they then placed in a plastic bag. RUM Hammond did not specifically testify regarding Herndon's shoes. The next day, the prosecutor moved to endorse CO Bentley to testify that Herndon's shoes had been removed from his feet during the strip search. The prosecutor explained that he had ex-

---

[71] We apply the "more probable than not" standard to these two issues because the primary effect the trial court's rulings had was to exclude evidence, and evidentiary issues fall into a nonconstitutional error category. See *People v Lukity*, 460 Mich 484, 494-495; 596 NW2d 607 (1999).

[72] *People v Gadomski*, 232 Mich App 24, 33; 592 NW2d 75 (1998).

pected this testimony to come from RUM Hammond and was surprised to find that RUM Hammond did not have a clear recollection of the shoes being taken from Herndon's feet, but that CO Bentley did remember this event. Defense counsel objected to the late endorsement, arguing that he was not prepared to cross-examine CO Bentley. The trial court overruled defense counsel's objection, noting that, although the testimony would be coming from a different witness, it would not surprise Herndon.

MCL 767.40a(4) permits a prosecutor to endorse a witness "at any time upon leave of the court and for good cause shown or by stipulation of the parties." The prosecutor provided this good cause by demonstrating that he had not endorsed CO Bentley before trial because he thought RUM Hammond would be able to provide this testimony. It only became clear during trial that he needed to call CO Bentley to testify. While the source of the testimony may have been a surprise, the contents were not. Further, Herndon did not request a continuance, evidently satisfied with the brief opportunity to speak with CO Bentley before he testified. Thus, we see no abuse of discretion by the trial court, nor any prejudice to Herndon that would otherwise merit granting him a new trial.[73]

### XI. DNA EVIDENCE

#### A. STANDARD OF REVIEW

Herndon argues that the trial court erred in admitting the DNA evidence the prosecutor used to prove that the blood found on his clothing was Sperle's

---

[73] See *People v Burwick*, 450 Mich 281, 295-296; 537 NW2d 813 (1995).

blood. Because he did not object at trial or request the pretrial hearing he now contends was necessary, Herndon has failed to preserve for appeal the several arguments that comprise this issue. Thus, our review is for plain error affecting his substantial rights.[74]

### B. FOUNDATION; PROBABILITY

Herndon first specifically argues that the trial court erred in admitting the DNA evidence because the prosecutor did not establish a proper foundation for its admissibility at a pretrial hearing. He contends that this pretrial hearing was necessary so that the prosecutor would be obligated to prove that the laboratory staff that conducted the DNA analysis followed proper procedures before the jury heard of the evidence. The implication is that a jury might hear about DNA evidence that would be inadmissible if the prosecutor is allowed to establish the evidence's admissibility during trial.

Herndon concedes that Michigan case law does not require a pretrial hearing, and we decline the opportunity to require one. This is not to say that, when presented with a different case, this Court or the Michigan Supreme Court might require this sort of hearing; as some other jurisdictions have done.[75] However, Herndon failed to request a pretrial hearing; the laboratory representatives, one of the nurses who drew Herndon's blood, and the officer who observed a second nurse draw his blood indicated that they

---

[74] *Carines, supra* at 774.

[75] See, generally, *State v Hoffman,* 768 So 2d 542, 565-566 (La, 2000), supplemented 768 So 2d 592 (La, 2000); *State v Bloom,* 516 NW2d 159, 164 (Minn, 1994).

had followed appropriate procedures; Herndon did not challenge their testimony concerning these procedures; and he has not provided any evidence that they actually deviated from proper procedures or that the DNA analysis was otherwise invalid. Accordingly, there was no plain error affecting his substantial rights and there is no reason to use this case as a vehicle to change trial procedure.

Herndon also asserts that the DNA evidence lacked a proper foundation because there was a missing link in the chain of custody of one blood sample because Heather Spillane, the official who took the sample from Trooper Benke, did not testify at trial that she delivered the sample to the person who performed the DNA testing. However, because Herndon does not contend that Spillane actually lost, misidentified, or tampered with his blood sample, only that it is possible that she did so, there was no question at trial that the blood sample was genuine, and a break in the chain of custody is not a fatal flaw,[76] this was not plain error requiring reversal.

Herndon's final argument with respect to the DNA evidence is that the prosecution's DNA expert witnesses failed to give sufficient testimony concerning the statistical probability that the blood found on Herndon's pants and shoes was Sperle's blood. By Ann Montgomery's calculations, the DNA in the bloodstain found on Herndon's shoes resembled Sperle's DNA profile with a frequency of 1 in 3.3 million Caucasians, 1 in 15 million Hispanics, and 1 in 440 million African-Americans. By Helton's calculations, the DNA in the bloodstain found on Herndon's pants resembled

---

[76] *People v Jennings,* 118 Mich App 318, 322; 324 NW2d 625 (1982).

Sperle's DNA with a frequency of 1 in 62.5 billion Caucasians, 1 in 1.1 trillion Hispanics, and 1 in 1.1 trillion African-Americans. Though we are aware that there can be serious problems with making these predictions because of a variety of factors, including insufficient data used for the purpose of comparison,[77] this sort of statistical evidence is generally admissible,[78] and Herndon has not shown that there was any particular flaw in the statistics generated in this case. As a whole, his challenge to the DNA evidence is merely conjecture ranging from what might have happened when his blood sample was under Spillane's control to whether these statistics accurately indicated the very low probability that the blood on his clothing could have been from someone other than Sperle. Thus, he has not shown the plain error and prejudice necessary to merit a new trial.[79]

### XII. EVIDENTIARY ISSUES PRESERVED AT TRIAL

#### A. STANDARD OF REVIEW

We review for abuse of discretion a trial court's decision to admit or exclude evidence.[80]

#### B. PRETRIAL "ADMISSION"

Herndon argues that the trial court erred in allowing, over his objection, testimony that he "admitted" during a pretrial hearing that he had committed

---

[77] See *People v George Adams*, 195 Mich App 267, 277-278; 489 NW2d 192 (1992).

[78] See *People v Chandler*, 211 Mich App 604, 611; 536 NW2d 799 (1995).

[79] See *Carines, supra* at 774.

[80] *People v McRunels*, 237 Mich App 168, 183; 603 NW2d 95 (1999).

the crime. The trial court held the hearing to rule on Herndon's claim that prison officials were denying him access to the materials he needed to prepare his defense. During cross-examination at the hearing, the prosecutor asked Herndon why it had taken him so long to file certain motions. Herndon explained that it was due to harassment and retaliation by the corrections officers because of his "crime." The prosecutor asked to bring out this testimony at trial by playing select portions of a videotape of the pretrial hearing, ostensibly to rebut Herndon's trial testimony that he did not kill Sperle. Defense counsel objected, arguing that Herndon's reference to "my crime" at the hearing was not an admission that he had committed the crime, it was just a slip of the tongue taken out of context, and it was unduly prejudicial. Defense counsel further argued that if the trial court played the videotape for the jury, Herndon was entitled to have the entire videotape played so the jury could hear the context in which he made the "my crime" statement. The trial court granted the prosecutor's request to play only parts of the videotape that were appropriate for the purpose of cross-examination, and allowed Herndon an opportunity to explain the context in which his statement was made. The jury heard and saw the following exchange on the videotape:

> [*Defendant*]: The possibility, or even allowed for the possibility that maybe, just maybe an officer somewhere is doing all this in retaliation for *my crime*.[81]
>
> [Tape fast-forwarded.]
>
> [*Defendant*]: You're saying the motion set could have been done before.

---

[81] Emphasis added.

[*Prosecutor*]: Uh-hm.

[*Defendant*]: Sure.

[*Prosecutor*]: And your claim is that these officers are harassing you because of the murder of Tammy Sperle?

[*Defendant*]: In retaliation, yes.

[Tape turned off]

Immediately after the prosecutor stopped playing the videotape, defense counsel conducted redirect examination of Herndon, at which time Herndon explained that the tape was only a portion of a lengthy hearing, noted the context in which his statement was made, asserted that he did not mean to say that he had committed a crime, and clarified that he was merely attempting to say that the officers were retaliating against him because of the nature of the *charges* against him. Herndon then reiterated that he has consistently denied responsibility for the death of the victim. During closing arguments, the prosecutor argued that Herndon made a Freudian slip when he referred to the murder of the victim as "my crime," thus suggesting that he was admitting guilt of the crime.

On appeal, Herndon first contends that this statement was not an "admission," and therefore inadmissible, because in the statement he did not concede his guilt of this crime. Statements against penal interest, such as a statement that admits guilt of a crime, are admissible under MRE 804(b)(3). However, whether Herndon truly admitted during the pretrial hearing that he had committed a "crime", making his statement admissible under MRE 804(b)(3), is irrelevant to our analysis. Here, the statement at issue was an admission of a party-opponent and thus properly submitted to the jury pursuant to MRE 801(d)(2). What

weight to give this statement was a question for the jury.[82]

Nevertheless, Herndon claims, the trial court should have excluded the statement under MRE 403 as substantially more unfairly prejudicial than probative. However, as the trial court noted, this evidence was probative of Herndon's claim that he did not kill Sperle, which was an essential issue at trial. Further, Herndon took advantage of the opportunity the trial court granted him to explain the full context of the statement and his harassment theory. Thus, in comparison, any unfair prejudice that flowed from this statement was relatively less than its probative value, not substantially greater.

Herndon also argues that the "doctrine of completeness" required the trial court to allow him to play the entire videotape for the jury. MRE 106 states:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

We see no error in the trial court's decision to allow Herndon to explain his alleged verbal mistake as well as the context in which he made it in lieu of playing a tape of a hearing that was not relevant at trial except for the portion the jury heard. This had the potential to be more compelling evidence in favor of the defense than the tape itself because Herndon could explain why he thought this was an inadvertent misstatement. Further, the portion of the videotape that

---

[82] See *McRunels*, *supra* at 181.

the jury heard was not just a snippet in which Herndon referred to his "crime." Though brief, it did provide a context for the statement, that is, that prison employees were harassing him. Playing more of the videotape was unnecessary.

### C. HEARSAY

Herndon challenges several rulings the trial court made at trial. First, the trial court ruled inadmissible a letter inmate Burt Lancaster wrote reporting to investigators that he had overheard someone say that he (this other inmate) ought to kill Sperle, evidently before the murder. Second, when Inspector David Prough testified that he heard from others that inmate Foster had an injury to his hand around the time of the murder, the trial court struck that portion of his testimony, limiting defense counsel's examination to questions concerning how Inspector Prough conducted his investigation. Third, the trial court ruled inadmissible Sgt. Berry's police report in which he recorded that an inmate had accused inmate Foster of committing the murder. Fourth, the trial court sustained the prosecutor's objection to Detective Fredrick Farkas' trial testimony referring to his investigation of other inmates who may have committed the murder and a news release mentioning those other suspects. Taken together, Herndon says, these rulings denied him his right to present a defense, namely, his theory that another inmate killed Sperle.

The problem with Herndon's argument is that each and every one of these rulings properly excluded hearsay because they repeated an out-of-court statement "offered in evidence to prove the truth of the

matter asserted."[83] We acknowledge that, in order to avoid denying the defendant a fair trial, even hearsay is admissible when "critical" to a defense.[84] In other words, Herndon's basic proposition—that a trial court may not completely eviscerate a defendant's attempt to cast doubt on the prosecutor's proofs simply because the evidence proposed is hearsay—is correct. However, in this case, we see no likelihood that these rulings denied Herndon a fair trial because he was able to present to the jury his theory that another inmate killed Sperle. For example, though the trial court excluded inmate Lancaster's letter from evidence, it nevertheless allowed defense counsel to question him extensively during trial about why he believed inmate Foster should be suspected of killing Sperle. The trial court also allowed defense counsel to question Detective Farkas thoroughly about the investigation into the crime, including other suspects.

Herndon's argument[85] that the trial court denied him the right to present a defense when it barred him from introducing into evidence Detective Farkas' whole interview with inmate Mass, who originally

---

[83] MRE 801(c).

[84] See *Chambers v Mississippi*, 410 US 284, 302; 93 S Ct 1038; 35 L Ed 2d 297 (1973) ("[In] circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.").

[85] Herndon contends that MRE 106 required the trial court to admit into evidence a transcript of Detective Farkas' interview with inmate Mass. However, he misunderstands the court rule. MRE 106 does not automatically permit an adverse party to introduce into evidence the rest of a document once the other party mentions a portion of it. Rather, MRE 106 logically limits the supplemental evidence to evidence that "ought in fairness to be considered contemporaneously with it." Herndon has not identified which part of this interview transcript would have affected the fairness of his trial, meriting admission. See *People v Hoffman*, 205 Mich App 1, 14-15; 518 NW2d 817 (1994). Therefore, he is not entitled to a new trial on this basis.

accused inmate Foster of killing Sperle but later explained that he and another inmate *conspired* to accuse inmate Foster falsely, also reveals an important aspect of this disputed evidence as a whole. This evidence was not inherently trustworthy. Trustworthiness is a factor other courts have found significant when concluding that the defendant's right to present a defense allowed hearsay evidence to be introduced to the jury.[86] Thus, the trial court did not err in excluding this evidence.

### D. HERNDON'S JOB DISMISSAL

Herndon argues that the trial court erred in denying his motion to exclude evidence that Sperle had dismissed him from his job at the prison store when it concluded that the evidence was relevant to a motive to kill her. He contends that the approximately eighteen months that elapsed between his termination and the murder and the competing evidence that he bore no grudge against Sperle made this evidence irrelevant to motive. We disagree. Though Herndon was entitled to argue to the jury that he never bore any ill will toward Sperle, the evidence that Sperle had fired him, coupled with the evidence that he sought to be reinstated to that position less than two months before the murder, was particularly important to demonstrating his motive for the killing. Though motive is not an essential element of this offense, it is

---

[86] See, e.g., *Chambers, supra* at 302 ("The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest."); *People v Barrera,* 451 Mich 261, 289-290; 547 NW2d 280 (1996) (multiple factors indicated that statement was reliable and trial court focused too heavily on minor inconsistencies).

generally relevant to show the intent necessary to prove murder.[87] Furthermore, though Herndon now claims that the trial court should have excluded this evidence on the basis of unfair prejudice[88] or as improper "similar acts" evidence under MRE 404(b),[89] he restricted his argument in the trial court to relevance, and thus he failed to preserve these arguments for appeal.[90] Given the strong probative value of this evidence, we see no reasonable possibility that this was plain error affecting Herndon's substantial rights.[91]

### E. PHOTOGRAPHS

Before trial, Herndon asked the trial court to exclude the photographs of Sperle and the murder scene, claiming that they were only intended to inflame the jury because of their gruesome nature. The trial court denied Herndon's motion in limine to exclude these photographs, noting that all evidence submitted to a jury was likely to have some sort of prejudicial effect. However, ruling on the admissibility of each photograph individually, the trial court noted that not all were "offensive" in the sense that they were gory. The trial court concluded that the

---

[87] See *People v Thomas Williams*, 143 Mich App 574, 585; 374 NW2d 158 (1985) (*Williams II*).

[88] MRE 403.

[89] We also note that Herndon claims that he was dismissed from his job at the prison store because of his injury, not because of any misconduct. Thus, we question whether evidence that he was dismissed is the type of "bad act" evidence usually excludable under MRE 404(b).

[90] See *People v Maleski*, 220 Mich App 518, 523; 560 NW2d 71 (1996) ("[G]enerally, an objection based on one ground at trial is insufficient to preserve an appellate attack based on a different ground.").

[91] See *Carines, supra* at 774.

photographs of Sperle and the scene were relevant to proving malice and, at least with regard to the photograph of the soup container near her foot, to tie Herndon to the murder. The trial court took care to require the prosecutor to crop at least one photograph to remove a portion of the image that revealed that medical personnel had performed a tracheotomy on Sperle so that the jury would not confuse that injury with the injuries she sustained in the crime. We agree that these photographs were prejudicial, as is most evidence submitted by the prosecution, but not so *unfairly* prejudicial that they should have been excluded under MRE 403.[92] These photographs were probative of Herndon's intent to kill Sperle and the pathologist's conclusion that Sperle died as a result of strangulation. The trial court spent considerable time examining the photographs and ruling on their admissibility one by one, considering the effect each would have on the jury. We trust the trial court's thoughtful exercise of discretion and conclude that these photographs were not inadmissible merely because they accurately portrayed a brutal murder.[93]

### XIII. SUFFICIENCY OF THE EVIDENCE

#### A. STANDARD OF REVIEW

Herndon claims that there was insufficient evidence of premeditation, deliberation, or motive to

---

[92] See *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995) ("All evidence offered by the parties is 'prejudicial' to some extent, but the fear of prejudice does not generally render the evidence inadmissible. It is only when the probative value is *substantially outweighed* by the danger of unfair prejudice that evidence is excluded.") (emphasis in original).

[93] See *People v Ho*, 231 Mich App 178, 188; 585 NW2d 357 (1998).

convict him of first-degree murder under MCL 750.316(1)(a), and insufficient evidence that Sperle was performing her official duties as a corrections officer at the time of the killing to support convicting him of first-degree murder under MCL 750.316(1)(c). We review the record ourselves, which essentially entails review de novo for this issue.[94]

## B. THE EVIDENCE

To determine whether Herndon's claim that there was insufficient evidence to convict him has merit, "this Court must view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt."[95] With respect to Herndon's challenge to the sufficiency of the evidence of first-degree murder under MCL 750.316(1)(a), the prosecutor relied on several different pieces of evidence to show premeditation and deliberation. For instance, the ligature used to strangle Sperle had a loop in it that made it appear like a noose. To take the step of creating a weapon to kill shows premeditation and deliberation. The evidence also indicated that it took some time to inflict as many blows as Sperle suffered, giving Herndon time to consider what was occurring.[96] Though circumstantial, as evidence of deliberation and premeditation frequently is, this evidence was sufficient.

---

[94] See *People v Ortiz-Kehoe*, 237 Mich App 508, 520; 603 NW2d 802 (1999).

[95] *People v Plummer*, 229 Mich App 293, 299; 581 NW2d 753 (1998).

[96] See *People v Kelly*, 231 Mich App 627, 642; 588 NW2d 480 (1998).

As for the question of motive, which would be additional circumstantial evidence of Herndon's premeditation,[97] the prosecutor did not have an obligation to prove motive beyond a reasonable doubt because it is not an element of the offense.[98] In any event, the prosecutor did provide proof that Herndon had a motive to kill Sperle because she had dismissed him from his job at the prison store and refused to rehire him. The jury was free to reject this theory and, instead, believe Herndon that he had no motive to kill. It did not do so, as was its prerogative.[99]

Herndon claims that the evidence that Sperle was performing her official duties at the time she was murdered was insufficient to support a conviction under MCL 750.316(1)(c). We disagree. Sperle was killed in her workplace during work hours. When the evidence is viewed in the light most favorable to the prosecution, the jury could reasonably infer that she had no reason to be in that area of the prison other than to be doing her work.

### XIV. FALSE TESTIMONY

#### A. STANDARD OF REVIEW

Herndon argues that he is entitled to a new trial because the prosecutor elicited false testimony from

---

[97] *People v Schollaert*, 194 Mich App 158, 170; 486 NW2d 312 (1992).

[98] See *People v Oliphant*, 399 Mich 472, 489; 250 NW2d 443 (1976) ("[M]otive is never an essential element to be proved in a criminal case."); see also *People v Mihalko*, 306 Mich 356, 361; 10 NW2d 914 (1943) ("In a prosecution for murder proof of motive, while not essential, is always relevant.").

[99] Cf. *People v Johnson*, 146 Mich App 429, 435-436; 381 NW2d 740 (1985) ("[D]efendant has cited no authority, and we find none, supporting the proposition that a jury is *required* to accept defendant's theory.") (emphasis in original).

CO Bentley. Because this due process issue presents a question of constitutional law, we review the issue de novo.[100]

## B. CO BENTLEY'S TESTIMONY

Herndon claims that the prosecutor moved to endorse CO Bentley during trial because the prosecutor had to support his assertion, made during the opening statement, that Herndon's shoes bearing Sperle's blood had been taken from him during the strip search, not from his cell as other evidence suggested. As this Court explained in *People v Lester*:[101]

> Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. Prosecutors therefore have a constitutional obligation to report to the defendant and to the trial court whenever government witnesses lie under oath.
>
> Michigan courts have also recognized that the prosecutor may not knowingly use false testimony to obtain a conviction, and that a prosecutor has a duty to correct false evidence.

We have no reason to conclude that CO Bentley testified falsely. More importantly, there is no indication in the record that, even if he testified falsely, the prosecutor knew he would testify falsely. Herndon attempts to use the prosecutor's decision to endorse CO Bentley as a witness after trial began to support his theory that the prosecutor knew that CO Bentley would testify falsely. However, the prosecutor gave a perfectly plausible explanation for this late endorse-

---

[100] See *People v Walker*, 234 Mich App 299, 302; 593 NW2d 673 (1999).

[101] *People v Lester*, 232 Mich App 262, 276; 591 NW2d 267 (1998) (citations omitted).

ment: he expected RUM Hammond to be able to provide this testimony, but it turned out that RUM Hammond had no direct recollection of seizing the shoes. We see no due process violation.

### XV. JURY VIEW

#### A. STANDARD OF REVIEW

Herndon maintains that the trial court erred in denying his motion to bring the jury to HVMF. Whether to grant a motion for a jury view is entrusted to the trial court's discretion, which requires us to review the issue for an abuse of that discretion.[102]

#### B. THE RISK OF IMPROPER COMMUNICATION

Herndon asked the trial court to allow the jury to view the scene of the murder. The trial court denied the motion, agreeing with the prosecutor that visiting HVMF not only posed a potential of physical danger, but that it also "posed the danger of prejudice and mistrial" from inmates yelling at the jurors in a way that might influence them. Further, the trial court noted, there was evidence on the record, including an aerial photograph and a diagram, that illustrated the layout of the prison for the jury and this layout was less critical in this case than in other cases.

MCL 768.28 and MCR 6.414(D) both permit a trial court, in its discretion, to allow the jury to visit a place where an event connected with the crime occurred. The court rule specifies that only a court officer may communicate with the jury "concerning a

---

[102] See *Levurn v King, supra* at 432.

subject connected with the trial."[103] However, both
the prosecutor and the trial court expressed legiti-
mate doubts about whether the prison officials would
be able to control the inmates and prevent them from
shouting remarks about the case to the jury, which
may have merited denying the motion in and of
itself.[104] When the risk of communication with the
jury was added to the inherent danger[105] of the locale
and the adequate evidence[106] of the layout of the HVMF
facility already in evidence, we cannot find any error
in the trial court's reasons for denying the motion,
much less an abuse of the trial court's discretion.

### XVI. REOPENING THE PROOFS

#### A. STANDARD OF REVIEW

Herndon argues that the trial court erred in denying
his motion to reopen proofs. We review this sort of
alleged error for an abuse of the trial court's
discretion.[107]

#### B. THE PROPOSED TESTIMONY

Herndon asked the trial court to allow him to call
two witnesses, one of whom had already testified, to
tell the jury that Herndon had been applying for new

---

[103] MCR 6.414(D).

[104] See *People v Huttenga*, 196 Mich App 633, 639; 493 NW2d 486 (1992)
(improper testimony at jury view).

[105] See *People v Mallory*, 421 Mich 229, 250; 365 NW2d 673 (1984) (dan-
ger to jury relevant consideration).

[106] See *People v Rice*, 192 Mich App 240, 246; 481 NW2d 10 (1991) (no
new trial necessary because adequate evidence of scene introduced at
trial).

[107] See, generally, *People v Shields*, 200 Mich App 554, 561; 504 NW2d
711 (1993).

jobs in the prison. The prosecutor contended that these witnesses were unnecessary because the prosecution did not dispute that Herndon was seeking a job in the prison. The trial court agreed, adding that the questions could have been asked already.

"Relevant in ruling on a motion to reopen proofs is whether any undue advantage would be taken by the moving party and whether there is any showing of surprise or prejudice to the nonmoving party."[108] The prosecutor never claimed surprise or prejudice in objecting to Herndon's motion to reopen the proofs. Nevertheless, prejudice and surprise are not exclusive considerations for this issue. The trial court retained the discretion to determine the admissibility of the proposed testimony as a threshold issue.[109] In this case, the trial court properly noted that the testimony was not relevant to an issue still in dispute and that, essentially, this testimony would be merely cumulative evidence,[110] having already been addressed by Herndon's testimony. Further, Herndon did not explain in the trial court why this testimony was relevant, and he fails to do so on appeal. Having no indication that this testimony was at all important to an issue in dispute at trial, we conclude that the trial court did not abuse its discretion in denying the motion.

---

[108] *People v Collier*, 168 Mich App 687, 694-695; 425 NW2d 118 (1988).

[109] See, generally, MCR 6.416 (party's discretion in choosing which witnesses to call is "[s]ubject to" the rules of criminal procedure and the rules of evidence); *People v Hackett*, 421 Mich 338, 349; 365 NW2d 120 (1984) ("The determination of admissibility is entrusted to the sound discretion of the trial court.").

[110] See MRE 403 ("Although relevant, evidence may be excluded . . . [on the basis of] needless presentation of cumulative evidence.").

## XVII. JURY INSTRUCTIONS

### A. STANDARD OF REVIEW

Herndon contends that the trial court erred in granting the prosecutor's motion to issue a special instruction to the jury concerning his inconsistent statement to corrections officers concerning how he sustained his hand injuries. We review this issue de novo.[111]

### B. FALSE STATEMENTS

The trial court issued the following instruction to the jury:

> There has been some evidence that the defendant has made a false statement to corrections officers when questioned about the injuries to his hands.
>
> This evidence does not prove guilt. A person may make a false statement for innocent reasons, such as panic, mistake or fear. However, a person may also make a false statement because of consciousness of guilt.
>
> You must decide if the defendant made the statements and if so whether or not they were false. However, if you find that the defendant made a false statement, you may consider the defendant's false statements to the corrections officers as evidence of guilt.

Herndon contends that this instruction overemphasized the prosecutor's theory of the case and that, as a matter of law, his statements could not be used as evidence of his guilt because they were never proved to be false and did not relate to an element of the offense.

---

[111] *People v Hubbard (After Remand)*, 217 Mich App 459, 487; 552 NW2d 493 (1996).

Quite plainly, the instructions strike a roughly even balance between favoring the defense and the prosecution. The trial court unequivocally informed the jury that the inconsistent statements alone did not prove Herndon's guilt and that there were several "innocent reasons" why a defendant might make such statements. The trial court also charged the jury to think about the evidence independently when determining whether the statements were in fact false; the trial court did not require the jury to accept that the statements were actually false. Thus, this instruction did not unduly favor the prosecution.

Herndon has not provided us with any authority supporting his argument that, for the jury to consider these inconsistent statements when pondering his guilt or innocence, the statements had to be directly related to an element of the offense in order "to be truly exculpatory." This proposition flies in the face of the jury's legitimate ability to consider circumstantial evidence when rendering a verdict.[112] Moreover, it is not error requiring reversal to instruct a jury that it could consider a false statement as evidence of guilt when there is other evidence also supporting the guilty verdict, as in this case.[113]

### XVIII. CUMULATIVE ERROR

Herndon contends that the errors in this case, even if they did not individually require reversal, collectively denied him a fair trial, meriting a new trial. We

---

[112] See *People v Nelson*, 234 Mich App 454, 459; 594 NW2d 114 (1999) ("Circumstantial evidence and reasonable inferences arising therefrom may be sufficient to prove the elements of a crime.").

[113] *People v Wolford*, 189 Mich App 478, 482; 473 NW2d 767 (1991).

disagree, having found no prejudicial errors that separately or cumulatively denied him a fair trial.[114]

We affirm Herndon's conviction but remand the case to the trial court for administrative correction of the judgment of sentence consistent with this opinion. We do not retain jurisdiction.

---

[114] See, generally, *People v Mayhew*, 236 Mich App 112, 128; 600 NW2d 370 (1999).