# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TYRELL LAMAR SHEPPARD,

        Defendant-Appellant.

UNPUBLISHED
July 18, 2017

No. 332422
Kalamazoo Circuit Court
LC No. 2015-001445-FC

Before: SAWYER, P.J., and HOEKSTRA and BECKERING, JJ.

PER CURIAM.

Defendant appeals as of right his convictions for armed robbery, MCL 750.529; kidnapping, MCL 750.349; and two counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced as a fourth-offense habitual offender, MCL 769.12, to 20 to 60 years' imprisonment for armed robbery, 8 to 30 years' imprisonment for kidnapping, and as a second-offense felony-firearm offender, MCL 750.227b(1), to 5 years' imprisonment for both counts of felony-firearm. We affirm defendant's conviction and sentence, but remand to the trial court for the administrative correction of defendant's judgment of sentence.

On October 11, 2015, Hosanna Washington drove from Kalamazoo to the Detroit area to pick up a new-used car, then headed back to her apartment in Kalamazoo. When Washington got back to her apartment, her boyfriend, Corwin Jett, was playing video games with his friends in the spare bedroom. The only friend that Washington recognized was Jamaal Conger, but defendant and another man were there as well. Washington did not pay much attention to the four men while she got ready to go out with her friends. After Washington left with her friends, Corwin and the others stayed and played video games until around midnight, then went to the liquor store and out to a party.

Washington got back to her apartment around 3 a.m. and got ready for bed. Washington heard a knock on her door, and when she went to answer it, she recognized Conger's voice. Conger told her that he forgot his wallet, so she unlocked the door to let him in and went back to her room. Washington heard Conger in the spare bedroom for a short while, and then Conger came into Washington's room accompanied by defendant. Both men seemed hostile, and Washington saw that Conger had a gun. The men appeared to be looking for something. They told Washington that Corwin had messed up and had to pay for it, and they kept asking

-1-

Washington "where is the money at?" The two men searched Washington's room, despite her attempts to tell them that she did not know what they were talking about.

While the men were searching Washington's room and Washington watched from the hallway, Corwin came back to Washington's apartment. When Washington saw Corwin in the doorway to the apartment, she told him to run. In response, Corwin ran, and Conger chased after him. While Washington was alone in her apartment with defendant, defendant grabbed Washington's laptop and a small television and left Washington in her apartment alone. About five minutes later, defendant returned to Washington's apartment without the items, but Washington noticed that defendant had a gun. Washington testified at trial that a gaming system and her debit card were also taken, but she did not specify who took those items. Once defendant was back in Washington's apartment, he grabbed Washington by the sweater she was wearing and walked her at gunpoint down the stairs of her apartment complex. Defendant had the keys to Washington's car and used the remote locking system on her key fob to locate the vehicle.

Once at Washington's car, defendant told her to get into the passenger side, and he got into the driver's seat. Defendant drove with Washington for a short period of time to the apartment complex next to Washington's. Once there, defendant parked the car. Defendant then began to talk on his phone and asked Washington for her debit card PIN information. Washington told defendant the wrong PIN number, and when defendant said that it was not working, Washington told him that it was likely because she bought a car earlier in the day so there was no money left in the account. After 30 to 45 minutes, Conger's vehicle pulled up next to Washington's parked car, and defendant got out of Washington's vehicle and left in Conger's.

Washington then called Corwin's sister, Brittany Jett, and told her what happened. Brittany told Washington that she was going to call the police and asked Washington to meet her at Washington's apartment. Washington eventually met Brittany, Corwin, and the police at her apartment. Washington was not familiar with defendant before the night of the robbery, but while talking with the police, Brittany showed Washington a photo of defendant, and Washington identified him as the man involved in the robbery with Conger. Later that morning, Washington identified defendant in a photo lineup.

Later on the same day as the robbery, Brittany texted Conger using Corwin's phone in an attempt to help authorities locate and apprehend Conger. At around 4 p.m. that day, the police apprehended Conger. However, the police were unable to apprehend defendant until two days later when he was arrested by Officer Trever Patterson of the Portage Department of Public Safety for driving without a license. During a search of defendant's vehicle, Officer Patterson found a nine-millimeter handgun with ammunition. The lead detective on the case, Jeff Baker, brought Washington to the police station to view the gun. Washington informed Detective Baker that it was the same size, color, and type of gun that was used in the robbery. Defendant was subsequently arrested and charged.

Before trial, defendant filed a motion to suppress the gun recovered as a result of the traffic stop because defendant believed that the stop was based on selective enforcement and violated his right to equal protection. After a hearing, the trial court found that defendant failed to prove that the officer discriminated against defendant on the basis of defendant's race. After

finding that the stop was otherwise valid because the officer witnessed defendant violating the law, the trial court denied defendant's motion.

On appeal, defendant argues that trial counsel was ineffective for (1) failing to object to inadmissible hearsay, (2) failing to object to two instance of prosecutorial misconduct, and (3) failing to request an adverse inference instruction. We disagree. "Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). "A judge must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *Id*. "The trial court's factual findings [if any] are reviewed for clear error, while its constitutional determinations are reviewed de novo." *People v Lopez*, 305 Mich App 686, 693-694; 854 NW2d 205 (2014) (citation and quotation marks omitted; alteration in original). Although defendant preserved this issue, "because no *Ginther* hearing was held, our review is limited to mistakes apparent on the record." *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009).

A defendant must meet a two-part test to warrant a new trial based on ineffective assistance of counsel: "First, the defendant must show that counsel's performance fell below an objective standard of reasonableness," and "[s]econd, the defendant must show that, but for counsel's deficient performance, a different result would have been reasonably probable." *People v Armstrong*, 490 Mich 281, 290; 806 NW2d 676 (2011). When claiming ineffective assistance of counsel, the "defendant bears a heavy burden in establishing that counsel's performance was deficient and that [the defendant] was prejudiced by the deficiency." *Lopez*, 305 Mich App at 693-694 (citation and quotation marks omitted).

Defendant first argues that defense counsel was ineffective for failing to object to an inadmissible hearsay statement. The alleged hearsay statement was made by Brittany during direct examination by the prosecution in the following excerpt:

*Q*. And during that interim, did you assist the police in trying to track down Jamaal Conger?

*A*. Yes.

*Q*. How do you do that?

*A*. Through text messages.

*Q*. With who's phone?

*A*. Corwin Jett's phone.

*Q*. All right.

And so you proceed with a series of text messages with Jamaal Conger?

-3-

*A.* Yes, I was just talking to him and he said, I'm sorry bro because he is thinking I'm Corwin as I am texting him; and Corey[1]—I had Corey's permission he was right there too. And he was just like, I'm sorry bro, it wasn't me, it was [defendant], it was him that did everything.

*Q.* We are not going to go into all of that, but you got – you got text messages back and forth?

*A.* Mmm hmm.

*Q.* And then as a result of those text messages, was Jamaal Conger apprehended, caught, arrested?

*A.* Right afterwards.

Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Hearsay "is generally inadmissible unless it falls under one of the hearsay exceptions set forth in the Michigan Rules of Evidence." *People v Stamper*, 480 Mich 1, 3; 472 NW2d 607 (2007), citing MRE 802. "If, however, the proponent of the evidence offers the statement for a purpose other than to prove the truth of the matter asserted, then the statement, by definition, is not hearsay." *People v Musser*, 494 Mich 337, 350; 835 NW2d 319 (2013).

Here, Brittany's statement was clearly hearsay. The prosecution argues on appeal that the statement was not made to prove the truth of the matter asserted, but rather was intended to elicit how Brittany assisted the police in apprehending Conger. Although the prosecution asked Brittany whether she texted Conger, Brittany's answer went beyond the prosecution's question and stated the contents of those messages. Brittany testified to what Conger said, which had no relation to how Conger was eventually apprehended. Therefore, the statement constitutes inadmissible hearsay without an exception. *Stamper*, 480 Mich at 3.

However, defense counsel was not ineffective by simply failing to object to this statement because that decision was arguably reasonable trial strategy. Defense "counsel is given wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases." *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008). Thus, there is a "strong presumption that trial counsel's performance was strategic." *Id*. at 242-243. In determining whether a decision was trial strategy, this Court must "affirmatively entertain the range of possible reasons that counsel may have had for proceeding as he or she did." *People v Gioglio (On Remand)*, 296 Mich App 12, 22; 815 NW2d 589 (2012), vacated in part on other grounds 493 Mich 864 (2012) (citation and quotation marks omitted).

---

[1] Corwin's nickname was Corey.

Here, the defense counsel may have intentionally refrained from objecting to Brittany's statement because counsel may have thought that an objection would emphasize the remark to the jury. By not objecting to the remark, defense counsel may have been deliberately attempting to minimize the attention the jury gave Brittany's statement. Not objecting to a statement to prevent the jury from paying special attention to the statement constitutes permissible trial strategy. This Court will not substitute its judgment for that of counsel regarding matters of trial strategy. *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002).

Even if defense counsel's decision to not object to the hearsay statement was objectively unreasonable, defendant failed to prove that he was prejudiced by the failure. *Armstrong*, 490 Mich at 290. Defendant's palm print was found on a television in Washington's spare bedroom; Washington identified defendant as one of the men that was in her bedroom on the night of the robbery; Washington testified at trial that she spent 30 to 45 minutes in a car with defendant on the night of the robbery; Washington identified defendant in a photo lineup shortly after the robbery occurred; Washington identified the gun that was found in defendant's car two days after the robbery as the same color, size, and type of gun used in the robbery; phone records from defendant's phone showed that defendant called Conger one time and Conger called defendant 13 times between 4:38 a.m. and 5:10 a.m., which was roughly the timeframe that Washington testified that she was in her car with defendant; Washington testified that when defendant eventually left her in her car, he left in Conger's car; and Detective Jeff Baker testified that video evidence showed Conger using a debit card at an ATM on the morning of the robbery and that bank records showed that Washington's debit card was used at that location at roughly the same time. Accordingly, given all of the evidence against defendant, it was not likely that a different outcome would have resulted if defense counsel had objected at trial. *Id*.

Defendant next argues that defense counsel was ineffective at trial for failing to object to the prosecution's alleged use of evidence not in the record. "Generally, [p]rosecutors are accorded great latitude regarding their arguments and conduct." *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995) (citation and quotation marks omitted; alteration in original). "Although a prosecutor may not argue facts not in evidence or mischaracterize the evidence presented, the prosecutor may argue reasonable inferences from the evidence." *People v Watson*, 245 Mich App 572, 588; 629 NW2d 411 (2001).

Defendant first argues that the prosecutor's remark during her closing argument that "[w]e have records that show that Jamaal Conger is trying to remove money from Washington's account" was not based on facts in the record. However, while he was questioned by the prosecution, Detective Baker made the following statements during trial:

*Q*. Why is that? Explain that to the Jury?

*A*. The witness statements had said that several phone calls were made back and forth during the time that Hosanna Washington was in the car with [defendant].

It was also important because at that time information was learned that [defendant] was asking for the PIN numbers for her debit card.

Our investigation ultimately showed that the debit card was attempted to be used several times during the five o'clock hour, roughly between 5:00 o'clock and 5:10, bank records show that it was used many times.

*Q.* By whom?

*A.* Jamaal Conger.

\* \* \*

*Q.* Okay.

So, do you have within your collection there when the attempts to take out money at the Shell Gas Station were?

I think that [defense counsel] showed you only the Fifth-Third Bank. Do you have the other—

*A.* I don't have that with me, no.

*Q.* Do you have access to it?

*A.* Yes.

*Q.* All right. Where?

*A.* It would be within my report.

*Q.* Okay, we would like to know when.

*A.* The information that I have in my report shows that the video from that shows that it is around 5:30 a.m.

*Q.* With regards to the Shell Gas Station?

*A.* By their time clock on their video, yes, 5:30.

*Q.* Okay, so not too far off of the—is it PNC Bank?

*A.* Fifth-Third.

*Q.* I'm sorry, Fifth-Third.

Um, so going from one location to the next location, is that correct?

*A.* Yes.

*Q.* So you actually got video of Jamaal Conger at that time?

*A.* Correct.

* * *

*Q.* And with regards to the ATM records you have shown what?

*A.* Shows that Jamaal Conger was trying to use the debit cards at the two locations at the Fifth-Third Bank and Shell gas station between 5:28 and 5:30 a.m.

Based on the foregoing testimony, the prosecution's remarks were reasonable inferences based on the evidence. *Watson*, 245 Mich App at 588. Defendant contends on appeal that bank records can only show when and where a debit card was used, not who used it. However, Detective Baker testified that video evidence showed Conger attempted to use an ATM at the location and time that bank records indicated that Washington's debit card was used. Therefore, defendant's argument is without merit.

Moreover, the trial court instructed the jurors that they were to decide the case based only on the evidence admitted during trial and that statements made by counsel were not evidence. Jurors are presumed to follow the trial court's instructions. See *Unger*, 278 Mich App at 235. As such, even if this evidence was not specifically in the record, the trial court's instruction prevented the jury from determining this case based on evidence not on the record or admitted at trial. See *People v Martzke*, 251 Mich App 282, 295; 651 NW2d 490 (2002) ("A carefully constructed limiting instruction rendered by the trial court would be sufficient to counterbalance any potential for prejudice . . . ."). Because there was no error, defense counsel was not ineffective for failing to object. *People v Putman*, 309 Mich App 240, 245; 870 NW2d 593 (2015) (holding that defense counsel was "not ineffective for failing to raise meritless or futile objections").

Defendant next contends that the prosecutor improperly stated in her closing argument that it was a fact "that cannot be refuted" that Conger placed "multiple phone calls between 4:44 and 5:11 to" defendant. At trial, phone records from defendant's phone were shown to the jury from the night of the robbery, and Detective Baker testified that he identified one phone number as belonging to defendant and the one as belonging to Conger. The detective went on to testify that the number registered to defendant called Conger once at 4:38 a.m., and then, beginning at 4:43 a.m., the number registered to Conger called defendant 13 times until 5:09 a.m. It was not an unreasonable inference for the prosecutor to conclude that defendant and Conger were the individuals using their phones at these times because the two numbers were registered to them. See *Watson*, 245 Mich App at 588. Further, the trial court's instruction to the jurors that they were not to consider statements made by counsel as evidence prevented the jurors from improperly considering facts not in evidence. *Unger*, 278 Mich App at 235. Accordingly, defense counsel was not ineffective in failing to object to the prosecutor's statement because any objection would have been futile. *Putman*, 309 Mich App at 245.

Next, defendant argues that defense counsel was ineffective at trial for failing to request an adverse inference instruction based on the prosecution's failure to play a recording of defendant's interview with Detective Baker as required by statute. We disagree.

-7-

Pursuant to MCL 763.8(2),

> A law enforcement official interrogating an individual in custodial detention regarding the individual's involvement in the commission of a major felony shall make a time-stamped, audiovisual recording of the entire interrogation. A major felony recording shall include the law enforcement official's notification to the individual of the individual's Miranda rights.

As used in MCL 763.8(2), " 'Major felony' means a felony punishable by imprisonment for life, for life or any term of years, or for a statutory maximum of 20 years or more[.]" MCL 763.7(d). Armed robbery is "punishable by imprisonment for life or for any term of years," MCL 750.529, and therefore satisfies the definition of a major felony under MCL 763.7(d). In the event that law enforcement officials fail to record a statement as required by MCL 763.8(2), MCL 763.9 provides as follows:

> Any failure to record a statement as required under section 8 of this chapter or to preserve a recorded statement does not prevent any law enforcement official present during the taking of the statement from testifying in court as to the circumstances and content of the individual's statement if the court determines that the statement is otherwise admissible. However, unless the individual objected to having the interrogation recorded and that objection was properly documented under section 8(3), the jury shall be instructed that it is the law of this state to record statements of an individual in custodial detention who is under interrogation for a major felony and that the jury may consider the absence of a recording in evaluating the evidence relating to the individual's statement.

It is unclear from the lower court record whether defendant's interview with Detective Baker was recorded. Even assuming that the interview was not recorded and MCL 763.8 was applicable, defendant's claim still fails. If MCL 763.8 was applicable, defense counsel's performance fell below an objectively reasonable standard because defense counsel failed to request the instruction. Moreover, by expressing approval with the trial court's instructions, defense counsel waived the trial court's error in failing to give the instruction to which defendant was entitled, also constituting ineffective assistance. See *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011) ("When defense counsel clearly expresses satisfaction with a trial court's decision, counsel's action will be deemed to constitute a waiver.").

However, defendant failed to establish that it was reasonably probable that a different outcome would have resulted but for defense counsel's performance. *Armstrong*, 490 Mich at 290. An instruction pursuant to MCL 763.9 would have potentially raised doubts with jurors regarding Detective Baker's credibility. However, even without the instruction, defense counsel adequately raised doubts regarding Detective Baker's credibility. Specifically, defense counsel questioned whether Detective Baker was believable given that he appeared to adjust his story to fit his own theory of what happened the night of the robbery. Defense counsel pointed to the detective's apparent flip-flop regarding what time zone the phone records were recorded in, stating that the detective originally testified that the records were in Eastern Standard Time, then

-8-

corrected that testimony and stated that the records were in Central Standard Time, then corrected himself again and testified that he was right the first time and the records were in Eastern Standard Time. Defense counsel argued that this was clearly an attempt to adjust the time of the phone calls to fit the detective's version of the events from that night.

Defense counsel also raised doubts about Detective Baker's recollection of his interview with defendant by questioning the detective's assertions that defendant lied to him. Specifically, defense counsel questioned the detective's assertion that defendant lied when he told the detective that he did not know Corwin because it was established at trial that most people knew Corwin by his nickname, Corey, and defendant could have been confused. Defense counsel also questioned the detective's assertion that defendant lied about being unfamiliar with Washington because defendant likely was unfamiliar with Washington based on Washington's own testimony that she was unfamiliar with defendant prior to the night of the robbery. Thus, defense counsel sufficiently brought into question whether the interview occurred how the detective stated that it did, which is the same function that the instruction under MCL 763.9 would have served. Accordingly, defendant failed to overcome the "heavy burden" that defense counsel's performance prejudiced him because defense counsel sufficiently brought into question whether the interview occurred how the detective stated that it did, which is the same function that the adverse inference instruction would have served. *Lopez*, 305 Mich App at 693-694.

Moreover, the trial court instructed the jury that they were only to consider Detective Baker's testimony regarding what defendant stated during the interview if the jury first concluded that the defendant actually made those statements. Jurors are presumed to follow the trial court's instructions. See *Unger*, 278 Mich App at 235. The trial court's instruction that the jury was not to consider defendant's alleged statement without first determining that defendant made the statement coupled with defense counsel's argument that Detective Baker's testimony attempted to manipulate the facts of the case made it unlikely that the outcome at trial would have been different but for defense counsel's performance. *Armstrong*, 490 Mich at 290. Accordingly, defense counsel was not ineffective. *Id*.

Defendant also argues on appeal that plain error occurred that affected his substantial rights on the same grounds that he argued that defense counsel was ineffective at trial. As previously stated, none of the errors identified by defendant on appeal affected the outcome of the lower court proceedings. Accordingly, we hold that defendant failed to establish plain error affecting substantial rights. See *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999) (stating that, for an error to affect substantial rights, the error must have "affected the outcome of the lower court proceedings").

Defendant next argues that he is entitled to resentencing because Offense Variable (OV) 12 was improperly scored at trial. We disagree. "Under the sentencing guidelines, the [trial] court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id*. "Clear error exists if the reviewing court is left with a definite and firm conviction that a mistake has been made." *People v Miller*, 482 Mich 540, 544; 759 NW2d 850 (2008) (citation and quotation marks omitted).

MCL 777.42(1) states that OV 12 "is contemporaneous felonious criminal acts." Pursuant to MCL 777.42(2), a felonious criminal act is contemporaneous if the "act occurred within 24 hours of the sentencing offense" and the "act has not and will not result in a separate conviction." Under MCL 777.42(1)(d), one contemporaneous felonious criminal act involving a crime against a person is assessed at five points; under subsection (f), one contemporaneous felonious criminal act involving any other crime is assessed at one point; and under subsection (g), no contemporaneous felonious criminal act is assessed at zero points.

At trial, defendant was also charged with first-degree home invasion under MCL 750.110a(2), but the prosecution dismissed the charge after the jury was unable to return a verdict and the trial court declared a mistrial. It is undisputed that the alleged home invasion took place within 24 hours of the crimes for which defendant was convicted. Further, first-degree home invasion is a felony. See *People v McCrady*, 244 Mich App 27, 32; 624 NW2d 761 (2000), (recognizing that first-degree home invasion was a felony). Thus, the only question on appeal is whether the trial court erred by finding by a preponderance of the evidence that defendant committed first-degree home invasion. *Hardy*, 494 Mich at 438. MCL 750.110a(2) states,

> A person who breaks and enters a dwelling with intent to commit a felony, larceny, or assault in the dwelling, *a person who enters a dwelling without permission with intent to commit a felony, larceny, or assault in the dwelling*, or a person who breaks and enters a dwelling or enters a dwelling without permission and, at any time while he or she is entering, present in, or exiting the dwelling, commits a felony, larceny, or assault *is guilty of home invasion in the first degree if at any time while the person is entering, present in, or exiting the dwelling either of the following circumstances exists*:
>
> (a) The person is armed with a dangerous weapon.
>
> (b) *Another person is lawfully present in the dwelling*. [Emphasis added.]

The trial court did not clearly err in finding by a preponderance of the evidence that defendant committed first-degree home invasion. *Hardy*, 494 Mich at 438. Washington testified that she was at home when she heard a knock at the door. When she answered, Conger told her that he left his wallet. Washington opened the door to let Conger come in; at no time did she give defendant permission. However, defendant and Conger eventually came into her bedroom together, and she saw that Conger had a gun. The two men then searched Washington's room as though they were looking for something and continually asked Washington where the money was. Based on this evidence, the trial court could reasonably have concluded that defendant entered Washington's apartment without permission with the intent of taking property from Washington's apartment without permission while Washington was lawfully present. MCL 750.110a(2). Because the trial court properly found by a preponderance of the evidence that defendant committed first-degree home invasion within 24 hours of the events that he was sentenced for, the trial court properly assessed five points for OV 12. *Hardy*, 494 Mich at 438.

Defendant also raised several arguments on appeal in a Standard 4 Brief.[2] First, defendant contends that defense counsel was ineffective for failing to impeach Washington. We disagree. Although defendant preserved this issue by filing a motion to remand, because this Court denied that motion, "review is limited to mistakes apparent on the record." *Payne*, 285 Mich App at 188.

As previously stated, a defendant must meet a two-part test to warrant a new trial based on ineffective assistance of counsel: "First, the defendant must show that counsel's performance fell below an objective standard of reasonableness," and "[s]econd, the defendant must show that, but for counsel's deficient performance, a different result would have been reasonably probable." *Armstrong*, 490 Mich at 290. This Court "will not substitute [its] judgment for that of defendant's counsel, nor will [it] use the benefit of hindsight to assess counsel's performance." *Unger*, 278 Mich App at 258. However, defense "[c]ounsel may provide ineffective assistance if counsel fails to develop the defendant's defenses by adequately impeaching the witnesses against defendant." *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014).

Defendant first argues that defense counsel was ineffective for failing to impeach Washington regarding certain allegations she made in her police report and during her preliminary examination that defendant sexually assaulted her. Defendant failed to provide the police report on appeal and therefore failed to establish that her testimony differed from her police report. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999) (stating that defendant "has the burden of establishing the factual predicate for his claim").

Even accepting defendant's account of the details in the police report as true, defendant failed to establish that defense counsel was ineffective. With regard to Washington's preliminary examination testimony differing from her police report, the account of the sexual assault detailed in Washington's police report was more detailed and accused defendant of more acts than her account of the events at the preliminary examination. Defense counsel's performance in its decision to not impeach Washington using her police report did not fall below an objectively reasonable standard because the decision was clearly trial strategy. *Unger*, 278 Mich App at 258. Moreover, defendant's charge of criminal sexual assault (CSC) was not bound over to the circuit court and the charge was dismissed. Accordingly, defendant failed to show that he was prejudiced. *Armstrong*, 490 Mich at 290.

Defendant next argues that defense counsel was ineffective for failing to impeach Washington at trial using her preliminary examination testimony. Specifically, defendant contends that, because Washington did not testify to any details regarding the alleged sexual assault at trial, defense counsel should have impeached Washington regarding the incident with her preliminary examination testimony. Again, defense counsel's decision to not impeach Washington was clear trial strategy. *Unger*, 278 Mich App at 258. Defense counsel likely did not want to present evidence to the jury that Washington previously testified that defendant attempted to sexually assault her out of fear that the jury would conclude that defendant was a

---

[2] See Michigan Supreme Court Administrative Order 2004-6, Standard 4.

bad person. See *People v VanderVliet*, 444 Mich 52, 104; 508 NW2d 114, 139 (1993), amended 445 Mich 1205 (1994) (stating that "*all* other acts evidence has the underlying inference that the defendant is a bad person"). This Court will not substitute its judgment for that of counsel regarding matters of trial strategy. *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). Because defense counsel's decision to not impeach Washington at trial using her preliminary examination testimony was trial strategy, defense counsel's performance did not fall below an objectively reasonable standard. *Armstrong*, 490 Mich at 290.

Defendant next argues that defense counsel was ineffective for failing to impeach Washington regarding her statement to police that both defendant and Conger were carrying guns when she first saw them. Assuming that defendant's account of what is contained in the police report is accurate, defendant mistakenly argues that defense counsel did not attempt to impeach Washington with this information. During cross-examination, the following exchange between Washington and defense counsel occurred:

> *Q*. Now do you know if each individual had a gun, it was the same gun or do you really know?
>
> *A*. I know that they both had a gun at some point, but I never seen both of them with a gun in their hand. I can't say that they didn't, but I did not see it.
>
> *Q*. Okay.
>
> Soon after the incident, could you have told a police officer that they both had guns and you got scared?
>
> *A*. Yes, because they both did have guns.
>
> *Q*. Okay.
>
> So did you mean that at that time or at that time, did you not remember if there were two guns or one gun?
>
> *A*. I know that they both had guns, but I never said the amount of numbers that they had; but I said they both had guns.
>
> *Q*. But you did say they both had guns and you got scared?
>
> *A*. Yes.

Defense counsel clearly attempted to impeach Washington regarding her alleged statement to police that both defendant and Conger were armed. Accordingly, defendant's claim that defense counsel was ineffective for failing to impeach Washington regarding the number of guns that defendant and Conger had is factually inaccurate and therefore without merit.

Lastly, defendant argues in his Standard 4 Brief that the trial court erred by denying his motion to suppress because the stop was based on selective enforcement and violated his right to

equal protection. "Generally, the proper procedure for a court when reviewing a motion to suppress evidence is to review de novo the ultimate decision and to review the trial court's findings of fact for clear error." *People v Walters*, 266 Mich App 341, 352; 700 NW2d 424 (2005). "Clear error exists if the reviewing court is left with a definite and firm conviction that a mistake has been made." *Miller*, 482 Mich at 544 (citation and quotation marks omitted).

In *Whren v United States*, 517 US 806, 813; 116 S Ct 1769; 135 L Ed 2d 89 (1996), the United States Supreme Court recognized that, during a traffic stop, "the Constitution prohibits selective enforcement of the law based on considerations such as race," but stated that such claims were properly brought under the Equal Protection Clause. "Selectivity in the enforcement of laws is not a violation of the [] constitution as to equal protection unless it is based upon race, religion or some other arbitrary classification." *Oakland Co Prosecuting Attorney v 46th Judicial Dist Judge*, 76 Mich App 318, 331; 256 NW2d 776 (1977). "Intentional or purposeful discrimination will not be presumed and there must be an affirmative showing of clear and intentional discrimination." *Id*. To prove intentional or purposeful discrimination, "[f]irst, it must be shown that the defendants were 'singled' out" for violating the law "while others similarly situated were not," and "[s]econd, it must be established that this discriminatory selection . . . was based on an impermissible ground such as race, sex, religion or the exercise of a fundamental right." *People v Ford*, 417 Mich 66, 102; 331 NW2d 878 (1982); see also *In re Hawley*, 238 Mich App 509, 513; 606 NW2d 50 (1999).

Here, defendant failed to establish that he was singled out by Officer Patterson. Officer Patterson testified that he followed defendant for one mile on a four-lane road and pulled defendant over for not traveling in the "curbside" lane. Officer Patterson testified that he had stopped dozens of people for the same violation, including several in the area in which he stopped defendant. Based on this evidence, defendant failed to show that he was singled out by Officer Patterson while others similarly situated were not. *Id*.

Moreover, even if defendant were singled out, he failed to show that it was on the basis of his race. Officer Patterson stated during the suppression hearing that he was unable to ascertain defendant's race or how many people were in defendant's vehicle while he was following the vehicle. The officer testified that he was not aware of defendant's race until he got to the driver's side door. No evidence was presented that contradicted the officer's testimony. Without knowing defendant's race, Officer Patterson could not have stopped defendant on the basis of his race and, therefore, could not have singled out defendant on the basis of defendant's race. *Id*.

To the extent that defendant challenges Officer's Patterson's stop on the basis that he did not violate the law, defendant's argument is also without merit. MCL 257.642(1)(a) states in relevant part as follows:

> Upon a roadway with 4 or more lanes that provides for 2-way movement of traffic, a vehicle shall be operated within the extreme right-hand lane except when overtaking and passing, but shall not cross the center line of the roadway except where making a left turn.

Officer Patterson testified that he followed defendant for 1 mile on a four-lane road and observed that defendant was not operating in the "curbside" lane, presumably meaning the "extreme right-hand lane." MCL 257.642(1)(a). Because Officer Patterson actually witnessed defendant violate the law, the stop was valid and the trial court did not err by denying defendant's motion to suppress. See *People v Chapo*, 283 Mich App 360, 366; 770 NW2d 68 (2009) ("A police officer who witnesses a civil infraction may stop and temporarily detain the offender for the purpose of issuing a written citation."); see also *People v Labelle*, 478 Mich 891, 891; 732 NW2d 114 (2007) ("If a stop of a motor vehicle is objectively lawful, the subjective intent of the officer is irrelevant to the validity of the stop or a subsequent arrest or search and seizure of evidence. That is, a valid stop on the basis of a traffic violation will not be invalidated on the ground that the officer had an ulterior motive when he or she made the stop. [Citation omitted.]").

Lastly, in reviewing the record to analyze the issues raised on appeal, we came across an error in defendant's judgment of sentence that, while not meriting substantive relief, nevertheless requires us to remand this case to the trial court to correct the administrative error. Specifically, defendant's judgment of sentence indicates that defendant was convicted of kidnapping under MCL 750.349, but defendant was actually tried and convicted of unlawful imprisonment under MCL 750.349b. Accordingly, we remand this case to the trial court for the administrative task of correcting defendant's judgment of sentence. See *People v Herndon*, 246 Mich App 371, 392-393; 633 NW2d 376 (2001).

Remanded for the task of correcting the error in the judgment of sentence. Otherwise, affirmed. We do not retain jurisdiction.

/s/ David H. Sawyer
/s/ Joel P. Hoekstra
/s/ Jane M. Beckering