*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* N. MORTON, Minor.

UNPUBLISHED
April 14, 2022

No. 356777
Genesee Circuit Court
Family Division
LC No. 15-132467-NA

Before: RONAYNE KRAUSE, P.J., and MURRAY and O'BRIEN, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order terminating her parental rights to the minor child, NM, pursuant to MCL 712A.19b(3)(c)(*i*), (i), and (j).[1] We affirm.

## I. FACTS

At the time the initial petition to remove NM from respondent's case was filed in January 2018, child protective proceedings involving three of respondent's other children, ML1, ML2, and AW, were already pending. Respondent's parental rights to these other children were later terminated in April 2018, and this Court affirmed that decision in *In re Lewis/Ward*, unpublished per curiam opinion of the Court of Appeals, issued March 19, 2019 (Docket No. 344087). This Court's opinion provides the following relevant facts regarding respondent's history with Children's Protective Services:

> In August 2015, the Department of Health and Human Services (the DHHS) filed a petition seeking removal of ML1, ML2, and AW from respondent-mother's care.[2] The DHHS's petition stemmed from allegations that respondent-mother's youngest child, AW, tested positive for THC at birth, and from an incident where ML2 suffered severe injury after consuming a large quantity of liquid Tylenol. In

---

[1] Although respondent also cites MCL 712A.19b(3)(g), the record discloses that the trial court did not rely on that ground as a statutory basis for termination.

[2] The two older boys, ML1 and ML2, were placed with their father. AW was adopted by his foster parents, who later also became NM's foster parents.

September 2015, respondent-mother admitted to the trial court's jurisdiction over the children and conceded that she had improperly supervised the children when ML2 consumed liquid Tylenol. The trial court ordered respondent-mother to undergo a substance abuse assessment and random drug screens, to complete parenting and anger management classes, to participate in parenting time and to work with an infant mental health specialist, and to obtain and maintain employment and suitable housing.

Respondent-mother participated in a number of services provided through [the] DHHS. She completed anger management and parenting classes and participated in parenting time and infant mental health classes. However, she continued to test positive for marijuana during random drug screens. In July 2016, respondent-mother was hospitalized following an outburst at a parenting time visit. During this hospitalization, respondent-mother was diagnosed with bipolar disorder, but refused medication. Respondent-mother was briefly incarcerated in October 2016, which caused her to miss a number of appointments.

Following a period of negative drug screens in January 2017 and her continued participation in parenting time, parenting classes, and infant mental health classes, respondent-mother was able to have the children during unsupervised overnight visits. During this time, the two older children, ML1 and ML2, were placed with their father, while AW remained in a foster care placement. After respondent-mother completed three consecutive negative drugs screens, the DHHS returned ML1 and ML2 to her in October 2017, and she was able to have AW for unsupervised overnight visits.

In January 2018, the DHHS moved to again remove the children from respondent-mother's care. The DHHS alleged that there was an incident of domestic violence at respondent-mother's home while the children were present. At approximately 3:00 a.m., respondent-mother's brother and her cousin[3] got into a fight and broke a glass table. Her brother was hospitalized and her cousin was arrested following the incident. Additionally, ML1 was so afraid during the fight that he urinated on himself. During that period, respondent-mother's electricity was shut off and she received an eviction notice. The DHHS filed a petition to terminate respondent-mother's parental rights in February 2018. Following evidentiary hearings in April 2018, the trial court entered an order terminating respondent-mother's parental rights to the three children. [*Id*., unpub op at 1-2.]

The January 22, 2018 removal petition with respect to NM also discussed the domestic-violence incident. The petition also alleged that respondent's power to her house had been turned off on January 10, 2018, and that respondent planned to live in a family member's home with 13 other

---

[3] Although referred to as respondent's cousin, this person is actually respondent's current boyfriend, Isaiah Johnson, who continued to reside with respondent. Respondent's brother sustained a broken jaw during the incident.

individuals, some of whom smoked marijuana in front of the children. Respondent had refused to enter a shelter or stay with another relative, and she planned to return to her home, where she had already received an eviction notice. Respondent had also told caseworkers that she was breaking up furniture to burn in a fireplace in her home for heat.

After NM was removed from respondent's care, respondent entered a plea of admission to allegations in the petition to enable the trial court to exercise jurisdiction over the child. Respondent received approximately three years of additional services, but never moved to unsupervised visits in the community. Following a hearing that concluded in February 2021, the trial court entered an order terminating respondent's parental rights to NM. This appeal followed.

## II. MOTION TO REOPEN PROOFS

Respondent first argues that the trial court abused its discretion when, after respondent had rested, it denied respondent's motion to reopen proofs during petitioner's rebuttal testimony to introduce a series of video recordings that respondent had made, which purported to show respondent's positive interactions with NM during visits. We disagree.

A trial court's decision to admit or exclude evidence is generally reviewed for an abuse of discretion. *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010). This Court also reviews a decision denying a motion to reopen proofs for an abuse of discretion. *People v Herndon*, 246 Mich App 371, 420; 633 NW2d 376 (2001). A trial court abuses its discretion when it "chooses an outcome falling outside the range of principled outcomes." *Edry*, 486 Mich at 639.

After respondent had rested, during the rebuttal testimony of the caseworker, Nicole Cooper, respondent's counsel disclosed for the first time that respondent had a series of video recordings that respondent had made of in-person visits, which depicted her interactions with NM. Counsel thought there were approximately 17 videos, but said there could be more. Counsel asked that she be allowed to play the videos for the witnesses, so they could comment on whether the information depicted in the videos was accurate. Counsel also sought to have them admitted as relevant evidence of respondent's actions during parenting time with NM. Petitioner objected because respondent had rested her case, she had not produced the videos earlier despite that the termination hearing began approximately three months earlier, and the late introduction of the videos was an unfair surprise. Petitioner also argued that respondent had not provided a valid reason to reopen proofs, given the testimony that many of the visits were indeed good, and thus the videos would be cumulative of that testimony. Petitioner also noted that if the agency had recorded visits, then petitioner should be allowed to reopen its proofs to be able to introduce videos of visits that had not gone well. Petitioner also objected on the basis that NM's foster parents were not permitted to record events involving NM.

The trial court questioned Cooper about whether she had seen both appropriate visits and visits where a problem had occurred. Cooper stated that out of the 30 visits she attended, one was "extremely bad," and another nine or so did not go very well. She did not know if the agency had recordings of any of respondent's visits. Counsel for NM concurred with petitioner's argument. The trial court stated that it was the court's understanding that respondent's videos depicted good visits, but noted that petitioner appeared to concede that many of the visits went fairly well. It also suggested that respondent may have other recordings that depicted problems during visits, but were

not being offered. The court noted that if respondent's videos were admitted, there could be additional videos that petitioner would want to introduce. The trial court then denied respondent's motion to admit the recordings, in part because the court was satisfied that they would be favorable to respondent in light of testimony to this effect.

In determining whether proofs should be reopened, the trial court must consider "whether any undue advantage would be taken by the moving party and whether there is any showing of surprise or prejudice to the nonmoving party." *Herndon*, 246 Mich App at 420. Other relevant factors include "whether newly discovered and material evidence is sought to be admitted, . . . and the timing of the motion." *People v Moore*, 164 Mich App 378, 383; 417 NW2d 508 (1987), mod in part on other grounds 433 Mich 851 (1989). Additionally, the trial court retains "the discretion to determine the admissibility of the proposed [evidence] as a threshold issue." *Herndon*, 246 Mich App at 420. Thus, in deciding a motion to reopen proofs, the trial court must consider whether the evidence sought to be presented is material and otherwise admissible. *Id.*; *Moore*, 164 Mich App at 383.

The trial court did not address whether the videos were relevant, but assuming that they were relevant, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403. The trial court determined that admission of the videos would cause undue delay. Respondent sought to admit the videos and elicit commentary regarding the accuracy of the events depicted in the videos. However, all of petitioner's witnesses, except for Cooper in rebuttal, had already testified. If the videos were admitted, fairness would have required that petitioner be allowed to recall various witnesses to address their observations in the videos or that petitioner be allowed to reopen its proofs to introduce videos it may have kept of visits that did not go well. These considerations support the trial court's determination that introduction of the videos would have resulted in undue delay, particularly where the hearing had already been ongoing for three months, thereby supporting exclusion under MRE 403.

The trial court also determined that the videos were needlessly cumulative of other evidence, specifically testimony already presented during the hearing. The court accepted respondent's offer of proof that the videos would depict favorable interactions between respondent and NM. The court stated that based on the testimony, it was "satisfied that many of the visits that mother had did in fact go satisfactorily." Cooper acknowledged that of the 30 visits she attended, approximately 20 of them went well. Respondent's brother testified that he saw video recordings that respondent had taken of recent in-person visits, and he claimed that respondent and NM were laughing and playing, and NM hugged and kissed respondent. Respondent's friends also testified about their observations of positive interactions between respondent and NM in videos of visits, and they reported that respondent did not act inappropriately, become angry, or end the visits early. More significantly, petitioner's witnesses did not deny that there were positive visits between respondent and NM. Although they testified that there were problems at several visits, they also agreed that many of the visits went well. Given that there was ample evidence that many of the visits went well, the trial court had a reasonable and principled basis for believing that the video evidence depicting favorable interaction between respondent and NM would have been cumulative of this evidence and was thus properly excluded under MRE 403.

Even if the videos were not barred by MRE 403, the trial court still did not abuse its discretion by not reopening proofs due to the timing of respondent's motion to reopen proofs and the undue advantage for respondent. The termination hearing was held over six days beginning on November 5, 2020, and continuing through the end of respondent's case-in-chief on February 6, 2021. Thus, respondent had at least three months to disclose the evidence that she had personally produced. Much of the trial court's discussion concerned the prejudice to petitioner because of the timing of the request. Neither respondent nor her attorney ever informed petitioner that the video footage existed until after respondent had rested and petitioner was in the middle of presenting rebuttal testimony. Respondent's late revelation clearly acted as an unfair surprise to petitioner and the court, regardless of whether the trial court had formally closed discovery. Further, the evidence was not newly discovered such that its exclusion could be considered unfair to respondent because she could not have produced it earlier. On the contrary, it was respondent who recorded the various visitations, so she clearly was aware of the evidence. Petitioner argued that if respondent was permitted to present her late-disclosed videos, it should be permitted to investigate whether the agency had also recorded visits and then allowed to reopen its own proofs to introduce videos of visits that had not gone well. The trial court agreed that if respondent's videos were admitted, despite their late production, petitioner in fairness should be allowed an opportunity to introduce other videos, if they still existed, otherwise the introduction of the favorable videos would provide an unfair advantage to respondent, particularly when others, such as the foster parents, were not permitted to make recordings.

In sum, the trial court did not abuse its discretion by denying respondent's motion to reopen proofs to admit the video evidence. Assuming the videos were relevant, the trial court did not abuse its discretion by concluding that the videos would cause undue delay and be needlessly cumulative such that the videos would be barred by MRE 403. Even if not barred by MRE 403, the trial court still did not abuse its discretion by refusing to allow respondent to reopen proofs because of the timing of respondent's motion and the undue advantage for respondent. Thus, respondent's argument that the trial court abused its discretion by not allowing respondent to reopen proofs fails.

III. STATUTORY GROUNDS FOR TERMINATION

Respondent next argues that the trial court erred by finding that petitioner established a statutory ground for termination by clear and convincing evidence. We disagree.

"In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). We review for clear error a trial court's ruling that a statutory ground for termination has been proved by clear and convincing evidence. *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011). "A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made." *Id*.

The trial court found that grounds for terminating respondent's parental rights were established under MCL 712A.19b(3)(c)(*i*), (i), and (j). MCL 712A.19b(3)(c)(*i*) allows for termination under the following circumstances:

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

The trial court did not clearly err by finding that respondent had not rectified the conditions that led to the adjudication. The conditions that led to adjudication included respondent-mother's lack of adequate housing, lack of proof of a source of income, untreated mental health issues, and continued substance abuse.

Respondent only partially rectified her initial housing problems. At the time of the termination hearing, respondent had a home with electricity, heat, and water, and it was large enough for NM to have her own room, but Cooper testified that she visited respondent's current home and had some concerns. The concerns included a broken latch on the screen door that could easily be opened by a young child to come and go without respondent's knowledge, a missing knob on the door to a closet where respondent kept cleaning supplies, easily accessible sharp kitchen knives, "a lot" of debris in the basement that included open containers of cat food, and improper ventilation. Respondent also continued to reside with Johnson, who had assaulted respondent's brother, resulting in the latter sustaining a broken jaw. In addition, Johnson had not provided information to enable the caseworkers to perform a background check on him. Johnson's involvement in at least one incident of domestic violence, his failure to provide information, and the other concerns identified by the caseworker support a finding that respondent's home was not suitable for NM.[4] The trial court did not clearly err when it found that this barrier to reunification had not been rectified.

With respect to respondent's income, Cooper testified that respondent reported that she was receiving both Social Security and unemployment benefits, but respondent never provided any supporting documentation for any of these alleged sources of income.

The most significant barrier to reunification was respondent's continued mental health issues. The evidence clearly established that respondent had not rectified this barrier to

---

[4] In our previous opinion, we affirmed the prior termination of respondent's other children in part because of respondent's refusal—not inability—to remove Johnson from her home despite the trauma that Johnson's violence caused to her children. Respondent admitted that violence in her home was normal and that she would have knocked her brother out if Johnson had not done so. *In re Lewis/Ward*, unpub op at p 5. Respondent's parental rights were therefore properly not terminated on the basis of being a victim of domestic violence, but on the basis of a complete unwillingness to protect her children from violence and possibly her own commission of violence. See *In re Plump*, 294 Mich App 270, 273; 817 NW2d 119 (2011). The fact that respondent continues to permit Johnson in her home despite our previous opinion underscores the reasonableness of the caseworker's concern.

reunification. Before NM's removal, respondent had been diagnosed with bipolar disorder, but she refused to take her psychotropic medication. At the January 31, 2018 preliminary hearing, the trial court agreed to allow NM to remain in respondent's care after she assured the court that she would begin taking her medication. The trial court also ordered respondent to undergo a psychological evaluation. At the continued February 14, 2018 preliminary hearing, the caseworker reported that respondent had another appointment with her psychiatrist and that petitioner was providing transportation, but that respondent continued to refuse to take her medication and intended to continue self-medicating with marijuana. Many witnesses testified regarding respondent's continued struggle with her mental health issues. Cooper testified that respondent had frequent mood swings, and respondent reported during one parenting-time visit that her counselor had recommended that she go to the hospital because the counselor was worried that respondent would harm herself or someone else. Respondent also told Cooper that she owned firearms even though she was prohibited from possessing them because of her criminal history, and respondent had threatened to use them to keep her other two boys away from their father. Cooper further testified that respondent's participation in mental health services had been sporadic, and respondent continued to refuse to take her medication. Cooper also stated that respondent had previously completed parenting and anger-management classes, but had not benefited from them. Respondent had told Cooper several times that she intended to get her other children back, and she stated that if her rights to NM were terminated, she intended to go to the foster home and demand to see NM. This caused Cooper to be concerned that NM would not be safe and that respondent would take matters into her own hands. Cooper did confirm with respondent's therapist that she met with respondent regularly, but the therapist also reported that she once wanted to refer respondent to a hospital because she was suicidal. Cooper also stated that, during visits, respondent would not wait until after a visit to ask questions, but would ask inappropriate questions during the visits in front of NM. Most of these conversations involved respondent "ranting about the system," and telling Cooper that the caseworkers should leave respondent alone. Further, Cooper testified that it was her understanding that respondent continued to smoke marijuana, but respondent had not completed a drug screen since August 9, 2019, when she tested positive for marijuana and cocaine.

Alta Parsons, a court-appointed special advocate for NM, stated that she observed NM participate in activities with respondent, but respondent did not initiate them, and Parsons had not seen NM look to respondent as her support person during visits. Parsons opined that over the four years that she had been assigned to respondent's case, respondent had not benefited from services. Respondent repeatedly expressed that she, not "the system," knew how to raise her children. Parsons also testified that respondent sometimes became frustrated that NM did not want to participate in visits, and she would tell NM that she was lucky that respondent had come to the visit or she would threaten to withhold treats if NM did not cooperate or provide affection to respondent. NM's infant mental health therapist testified that respondent's mood during visits was inconsistent. When respondent was not in a good mood during visits, NM would exhibit distress and not want to be around or interact with respondent.

Respondent acknowledged that she "stormed out" of a hearing on June 25, 2019, when the trial court ordered a return to supervised parenting time. Respondent also acknowledged that she became so upset during a visit that NM had called her foster mother "mommy" that she grabbed her backpack, left the lobby, and ended the visit. When asked why she did not want to take her

psychotropic medications, respondent stated that she had tried it, but it caused her to "freak out" at one of the foster parents, so she stopped because she was "crazy enough without it."

In sum, clear and convincing evidence supports that respondent's mental and emotional instability remained a barrier to reunification. Further, considering respondent's continued refusal to take her medications, her lack of success in her attempt at self-medication with marijuana and/or cocaine, and her failure to benefit from services to address her mental and emotional instability, the trial court did not clearly err by finding that this condition was not reasonably likely to be rectified within a reasonable time. Accordingly, the evidence supported termination of respondent's parental rights under § 19b(3)(c)(*i*).[5]

## IV. BEST INTERESTS

Respondent also argues that the trial court erred when it found that termination of her parental rights was in NM's best interests. We disagree.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). We review for clear error a trial court's finding that termination of parental rights is in a child's best interests. *In re Payne/Pumphrey/Fortson*, 311 Mich App 49, 63; 874 NW2d 205 (2015). When applying this standard, "regard is to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989); see also MCR 2.613(C).

Whether termination of parental rights is in a child's best interests is determined by a preponderance of the evidence. *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). Factors to be considered include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *Id*. at 41-42 (citations omitted). A court may also consider whether it is likely "that the child could be returned to her parents' home within the foreseeable future, if at all." *In re Frey*, 297 Mich App 242, 248-249; 824 NW2d 569 (2012).

The trial court did not clearly err when it found that termination of respondent's parental rights was in NM's best interests. By the end of the termination hearing, NM had been in petitioner's care for approximately three years, which was most of her life. During that time, respondent obtained housing that likely would be suitable if respondent addressed the safety issues with the home and if Johnson cooperated with the caseworkers by providing necessary information for a background check. It also appears that respondent had a source of income, but the amount was uncertain because she did not furnish requested information to the caseworkers. However,

---

[5] Only one statutory ground is required to terminate a respondent's parental rights; therefore, we need not address respondent's argument that the trial court erred by terminating her parental rights under MCL 712A.19b(3)(i), and (j). See *In re Frey*, 297 Mich App at 244.

respondent's admission that she had previously supplemented her income by selling cocaine is particularly troubling, especially where respondent had not participated in drug screening for eight months before termination.

In addition, respondent's mental and emotional health remained unstable, which was apparent during many parental visits, and NM was not particularly bonded with respondent. Testimony supports the trial court's finding that many of the visits went well and that there was no question that respondent loved NM, but the evidence also indicated that there were many visits that went poorly, sometimes causing NM to have stress-induced asthma attacks, and that NM had developed a stronger bond with her foster parents, whom she looked to for support and guidance. Cooper had seen NM interact with both her foster parents and respondent. Cooper maintained that during visits with respondent that went poorly, NM became upset, did not want to participate without her foster mother present, and often attempted to end visits early. It was very obvious to Cooper that NM preferred her foster parents, whom she referred to as mom and dad, whereas she referred to respondent by her first name. According to Cooper, NM told her that she did not like respondent and did not want to be with her, and that even respondent had admitted to Cooper that she did not have a bond with NM. By contrast, NM's brother AW was in the same foster home and the two had a very good relationship.

NM's infant mental health therapist similarly testified that NM was happy to be in her foster home with her brother and had a good attachment with the foster parents. The therapist had also watched NM interact with respondent. Some of the interactions were positive, but depending on respondent's mood during the visit, NM would sometimes show distress and did not want to be around or interact with respondent. NM also sometimes showed distress at the beginning of visits because she did not want her foster mother to leave the room. The therapist did not believe that respondent could currently meet NM's emotional needs. The therapist also stated that it would not be good or healthy for NM to live with respondent currently, and could not provide a time frame for when this could change. The therapist agreed that keeping siblings together was an important factor in establishing permanence, which NM needed.

Parsons similarly testified that NM was very much at ease with her foster family, initiated interaction, and was very playful. NM also sought interaction with Parsons, but not with respondent. Parsons was concerned that NM's interactions with respondent could lead to trauma, and NM had already begun to develop negative behaviors in connection with visits. Parsons believed that respondent's parental rights should be terminated because she had witnessed multiple occasions when she feared for NM's safety, and Parsons had witnessed NM being treated like a person who was there to help the adult, rather than the other way around. Parsons did not see evidence that NM was bonding with respondent. Parsons also testified that she had met Johnson, who resided in respondent's home. Johnson did not share Parsons's opinion about how to raise children, and he believed that it was appropriate to be "much more physical" when raising a child.[6] Parsons testified that NM seeks out her foster parents, and she looked to them to be picked up or comforted, and to provide rules and organization in the home.

---

[6] See footnote 4.

NM's foster mother testified that she and her husband had adopted NM's brother, AW, and they were willing to also adopt NM, thereby enabling the siblings to remain together. Caseworker Caroline Ostrander believed that termination of respondent's parental rights was in NM's best interests because she had been in the system for almost all of the three years of her life and she was in need of permanency, and because respondent had not made sufficient progress despite the services offered to her. The foregoing testimony supports the trial court's determination that termination of respondent's parental rights was in NM's best interests.

Affirmed.


/s/ Amy Ronayne Krause
/s/ Christopher M. Murray
/s/ Colleen A. O'Brien